**David ZIMMERMAN and Marianne Zimmerman, d/b/a Frontier Lanes, Appellees,**

**v.**

**HARLEYSVILLE MUTUAL INSURANCE COMPANY, Appellant.**

**David Zimmerman and Marianne Zimmerman, d/b/a Frontier Lanes, Appellants,**

**v.**

**Harleysville Mutual Insurance Company, Appellee.**

Superior Court of Pennsylvania.

Argued May 25, 2004.
Filed Sept. 30, 2004.

Robert E. Dapper, Pittsburgh, for Harleysville.

Kenneth W. Wargo, Erie, for Zimmerman.

BEFORE: HUDOCK, JOYCE, MUSMANNO, KLEIN, BENDER, BOWES *, GANTMAN, McCAFFERY and PANELLA, JJ.

OPINION BY MUSMANNO, J.:

¶ 1 Harleysville Mutual Insurance Company ("Harleysville") appeals from the $756,009.00 judgment entered in favor of David Zimmerman ("David") and Marianne Zimmerman ("Marianne") (collectively, the "Zimmermans"), d/b/a/ Frontier Lanes, for their insurance bad faith claim against Harleysville. The Zimmermans have filed a cross-appeal from the judgment entered by the trial court. We affirm.

¶ 2 This case originated as an insurance coverage dispute between the Zimmermans, Harleysville, and Fireman's Fund Insurance Company ("Fireman's"). In a prior appeal, this Court summarized the factual and procedural history of the coverage dispute as follows:

Since 1987, [the Zimmermans] have owned and operated Frontier Lanes, a bowling alley, with a lounge.[1] The bowling lanes were housed in a building with

---

* Judge BOWES did not participate in the consideration or decision of this case.

1. The Zimmermans also sold and serviced billiard tables out of this location.

an arched roof supported by laminated timber trusses. An aluminum gridwork hung from the roof and supported a suspended tile ceiling which had an overlay of insulation and paper.

From the time of the purchase until June 30, 1993, [the Zimmermans'] business insurance [2] was provided by [Fireman's]. In April 1993, Fireman's informed [the Zimmermans] that they would no longer write workers' compensation policies for small accounts. Through their agent, [the Zimmermans] submitted an application for coverage, including workers' compensation, to [Harleysville,] which on June 21, 1993 agreed to "write the account." [The Zimmermans'] agent worked out details of coverage with the Harleysville underwriter on June 25 and had [the Zimmermans] sign the policies on June 30, 1993. Harleysville did not inspect the bowling alley before writing the insurance [policies].

On June 28, 1993, tiles fell from the ceiling of the bowling alley.[3] On July 2, 1993, [the Zimmermans] called their agent for a recommendation of someone to determine what the problem was. On July 13, 1993, the recommended contractor, accompanied by [David], investigated the area above the ceiling and found that three of sixteen trusses supporting the roof had begun to separate.[4] No immediate repairs were recommended, but it was suggested that an engineer look at the problem. Based on the con-

tractor's report of July 14, 1993, [stating] that damage had been caused by the heavy ice and snow of the previous winter, a loss report was filed with [Fireman's].

On July 23, 1993, a structural engineer retained by Fireman's examined the building. He advised [the Zimmermans] to hire their own contractor and, on July 26, 1993 issued a report in which he found that eight of the sixteen trusses were "failing/failed and in danger of collapsing." As advised, [the Zimmermans] hired a local contractor, who inspected the bowling alley, accompanied by a second engineer on July 26, 1993. Both agreed they would wait for Fireman's engineer's report before undertaking repairs.

In the early evening of July 29, 1993, a day of high winds, [David] returned to his office, and once again, found tiles and gridwork on the alleys. After cleaning up the debris and calling his wife to tell her what had happened, he heard a loud snap and saw additional tiles and gridwork start to fall. Running to the counter area, he hid under a desk while the roof of the building collapsed.

Claims for the loss from collapse of the structure were filed with both Fireman's and Harleysville. On September 14, 1993, Fireman's agent sent [the Zimmermans] a check for $21,798 for the

---

2. The package included property coverage, a commercial automobile policy, workers['] compensation and general liability coverage.

3. This was actually the third incident involving the ceiling. In late 1992 and early 1993, [the Zimmermans] had become aware that the gridwork over the alleys had separated and sagged causing tiles to fall. Simple repairs were made to correct the condition on two or three occasions. In May 1993, tiles again fell and repairs were made. On May

13, 1993, in the course of an annual insurance review on the premises, [David] informed his insurance agent of the damage from the tiles. No claim was filed, however, because the agent indicated that the damage would be below the policy deductible.

4. The contractor also found the attic to be in good condition, with no indication of dry rot, water damming or leakage.

pre-collapse repair of eight trusses [5] and denied any further liability. On November 5, 1993, Harleysville declined to cover the claim, stating that Fireman's was responsible for the loss. On December 17, 1993, [the Zimmermans] brought suit for declaratory relief asking the Court to determine which policy provided coverage. The parties stipulated to the operative facts, and filed cross-motions for summary judgment. On June 30, 1995, the trial court held [that] Harleysville was obligated to indemnify [the Zimmermans] for all damage, except the amount tendered earlier by Fireman's; Harleysville's obligation was $668,828.00. A final order was entered on June 12, 1996.

*Zimmerman v. Harleysville Mut. Ins. Co., et al.,* No. 1283 Pittsburgh 1996, 701 A.2d 792 (Pa.Super. filed June 18, 1997), slip opinion at 1–4 (footnotes in original). Thereafter, Harleysville filed an appeal.

¶ 3 On appeal, a panel of this Court affirmed the judgment of the trial court. *Id.* In an unpublished Memorandum, the panel noted that Harleysville disclaimed responsibility for coverage of the roof collapse on the grounds that (a) under the language of the policy, there was no coverage; and (b) the Zimmermans violated their contractual obligations because they did not disclose the defect to Harleysville. *Id.* at 5–6. The Zimmermans countered that both the windstorm and the weight of the snow were specified causes of the loss. *Id.* at 6. They asserted that nothing in the

policy required them to prove that the precipitating cause (the weight of the snow) of the ultimate loss occurred during the policy period. *Id.* The Zimmermans further argued that the legal theories advanced by Harleysville, *i.e.,* "loss in progress" and "fortuity," each require evidence that the Zimmermans had prior knowledge of an ongoing or imminent collapse, which they did not have. *Id.*

¶ 4 In resolving Harleysville's claims, this Court did not disturb the trial court's finding of fact that two "occurrences" [6] had caused distinct effects to the structure at different times: "the injurious effect of the past winter weather occurred when tiles fell and the trusses began to separate; and the injurious effect of high winds took place when the roof collapsed." *Id.* at 8. The panel further concluded that there is no ambiguity in Pennsylvania law for determining liability when damages occur over time and under different insurers. Specifically, the panel concluded that Pennsylvania has not adopted the "loss in progress" theory advanced by Harleysville, but has adopted the "cause and effect" test first set forth in *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.,* 676 F.2d 56 (3d Cir.1982), and adopted by this Court in *D'Auria v. Zurich Ins. Co.,* 352 Pa.Super. 231, 507 A.2d 857 (1986). *Zimmerman,* slip opinion at 8. "This test looks to whether there was but one proximate, uninterrupted and continuing 'cause' or whether there were multiple occurrences." *Id.*

---

**5.** This sum was for repair of five trusses identified as damaged in the July 13, 1993 inspection and for three additional trusses reported as damaged by Fireman's engineer on July 23, 1993.

**6.** "Occurrence" is defined under the Harleysville policy as "an accident, including continuous or repeated exposure to substantially the same general harmful condition." Harleysville Policy, Commercial General Liability

Coverage Form, Section V(9). "Accident," while not a defined term in the Harleysville policy, has been defined by the Pennsylvania Supreme Court as "an unanticipated event [or] ... something which occurs not as the result of natural routine but as a culmination of forces working without design, coordination or plan." *Brenneman v. St. Paul Fire and Marine Ins. Co.,* 411 Pa. 409, 192 A.2d 745, 747 (1963).

"In the latter situation, the court fixes the time of the occurrence by reference to the time when the injurious *effects* of the occurrence took place." *Id.* (emphasis in original) (citing *Appalachian Ins. Co.*, 676 F.2d at 62). Because "Pennsylvania law provides clear authority for determining liability when damages occur over time and under different insurers[,]" and "[i]n the absence of ambiguity in this area of the law," the panel held that Harleysville was the insurer when the collapse occurred and therefore liable for the loss. *Id.* at 9.

¶ 5 Harleysville also had claimed that because the Zimmermans were aware of the ongoing structural damage, the loss fell outside of the policy, which limited coverage to "fortuitous" events. This Court disagreed, specifically stating that Harleysville provided *no evidence* that the Zimmermans had knowledge, prior to the issuance of the policy, that the roof was in danger of collapse. *Id.* at 10.

¶ 6 The panel likewise found no merit to Harleysville's claim that the Zimmermans, knowing of the potential roof failure, failed to protect their property as required by the policy. *Id.* at 11–12. This Court noted that the Zimmermans were warned of the possibility of collapse only six days prior to the collapse, and after Harleysville's policy had taken effect. *Id.* Additionally, this Court referred to evidence of record that the Zimmermans immediately had contacted a contractor and engineer and that, "[o]n their advice[,] ... were

awaiting an engineer's report, before proceeding with repairs, when the roof collapsed on July 29, 1993." *Id.* Thus, there was no evidence that the Zimmermans knew of the possibility of collapse until almost one month after Harleysville's policy took effect.

¶ 7 On these bases, this Court affirmed the judgment of the trial court. The Supreme Court initially granted Harleysville's Petition for allowance of appeal, but later dismissed the appeal as improvidently granted. *Zimmerman v. Harleysville Mut. Ins. Co.*, 553 Pa. 74, 717 A.2d 1024 (1998).

¶ 8 On November 10, 1997, the Zimmermans commenced the instant action alleging bad faith by Harleysville pursuant to 42 Pa.C.S.A. § 8371.[7] The Zimmermans presented evidence that they suffered economic hardship, including, *inter alia*, the loss of their business, as a direct result of Harleysville's bad faith.[8]

¶ 9 After a non-jury trial on stipulated facts, the trial court entered a verdict in favor of the Zimmermans. The trial court found that Harleysville failed to make an objective and intelligent appraisal of the Zimmerman's claim, and failed to assess, reasonably and realistically, the circumstances and chances of gaining a verdict in their favor in the coverage litigation. Trial Court Opinion, 1/30/02, at 5. The trial court further found that Harleysville's legal theory of "loss in progress" was tenuous at best, *and* that Harleysville failed to

---

**7.** Section 8371 provides that "if the court finds that the insurer has acted in bad faith toward the insured," the court may (1) award interest on the amount of the claim from the date the claim was made by the insured, (2) award punitive damages against the insurer, and/or (3) assess court costs and attorney's fees against the insurer. 42 Pa.C.S.A. § 8371.

**8.** The Zimmermans demonstrated that, as a result of Harleysville's failure to tender the coverage amounts, they lost their bowling

business and were unable to pay their creditors. The Zimmermans further presented evidence that they were subject to criminal charges based upon Harleysville's failure to tender the amount necessary to clean up the debris on the property. Harleysville did not tender the funds necessary to clean the property until several months after the Zimmermans were found guilty of a violation of the City Building Code and fined.

observe its concomitant obligation to avoid pursuing its theory in a manner likely to cause additional injury and damage to the insured. *Id.* For these reasons, the trial court awarded the Zimmermans the amount of $756,009.00, which included compensatory damages, punitive damages, interest, and counsel fees. Harleysville and the Zimmermans filed post-trial motions, which the trial court denied. Thereafter, Harleysville filed the instant timely appeal, and the Zimmermans filed a cross-appeal. We will first address the claims raised by Harleysville.

¶ 10 Harleysville presents the following claims for our review:

A. In a bad faith lawsuit, whether the insurer had a reasonable basis to deny, defend, and appeal the insured's claim for insurance coverage where the law was complex and the insurer consistently relied on the advice of respected counsel?

B. Whether the trial court's stated bases for its bad faith ruling are supported by the record and constitute bad faith even though an insurer is not required to submerge its interest to the insured?

C. Whether the trial court erred in awarding punitive damages and stating that a showing of "bad faith *per se* " may be sufficient to impose punitive damages?

Brief for Appellant at 4.

¶ 11 In its first two claims, Harleysville contends that the trial court erred when it concluded that the Zimmermans had established a bad faith claim against Harleysville. In this regard, Harleysville alleges that (a) it had a reasonable basis to deny and defend the claim; (b) it relied upon the advice of counsel; and (c) the trial court's bases for finding bad faith are not supported in the record.

¶ 12 As an appellate court, we review the trial court's final judgment to determine whether the findings of the trial court are supported by competent evidence, and whether the trial court committed error in the application of the law. *Bergman v. United Serv. Auto. Ass'n,* 742 A.2d 1101, 1104 (Pa.Super.1999). Where a trial is held before a judge in a non-jury case, the findings of the trial judge must be given the same weight as a jury verdict. *Id.* It is the trial judge's function to evaluate evidence adduced at trial to reach a determination as to the facts. *Bonenberger v. Nationwide Mut. Ins. Co.,* 791 A.2d 378, 381 (2002). It is not the role of an appellate court to pass on the credibility of witnesses or to act as the trier of fact, and an appellate court will not substitute its judgment for that of the fact-finder. *Id.*

¶ 13 Section 8371 of title 42, which created the statutory cause of action against insurance companies for acts of bad faith, does not define what conduct constitutes "bad faith." However, in *Williams v. Nationwide Mut. Ins. Co.,* 750 A.2d 881 (Pa.Super.2000), this Court stated as follows:

The breach of the obligation to act in good faith cannot be precisely defined in all circumstances, however, examples of "bad faith" conduct include: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."

*Id.* at 887 (quoting *Kaplan v. Cablevision of Pennsylvania, Inc.,* 448 Pa.Super. 306, 671 A.2d 716, 722 (1996)). To succeed in a bad faith claim, the insured must present clear and convincing evidence that "the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disre-

garded its lack of reasonable basis in denying the claim." *O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa.Super.1999) (citing *MGA Ins. Co. v. Bakos*, 699 A.2d 751, 754 (Pa.Super.1997)). Bad faith claims are fact-specific and depend upon the specific conduct of the insurer *vis-a-vis* its insured.

¶ 14 This Court has stated that the purpose of section 8371 is:

> To provide a statutory remedy to an insured when the insurer denied benefits in bad faith. Upon review of the express language and purpose of section 8371, it appears clear that the Pennsylvania legislature intended this section to protect an insured from bad faith denials of coverage.

*General Accident Ins. Co. v. Federal Kemper Ins. Co.*, 452 Pa.Super. 581, 682 A.2d 819, 822 (1996). The scope of section 8371 has been extended to the investigatory practices of an insurer during litigation initiated by an insured to obtain the proceeds of his or her insurance policy. *O'Donnell*, 734 A.2d at 906.

¶ 15 In its Opinion dated January 30, 2002, the trial court set forth specific Findings of Fact in support of its verdict in favor of the Zimmermans. The trial court found that Harleysville had continued to advance its claim that the Zimmermans concealed information regarding the condition of the roof when they applied for insurance, when there was no evidence to support this contention. *See* Trial Court Opinion, 1/30/02, at 3 (Finding of Fact No. 1). This Court confirmed Harleysville's lack of evidence regarding its claim. *See Zimmerman*, slip opinion at 9–11.

¶ 16 The trial court also found that Harleysville continued to advance its claim that the Zimmermans knew or should have known that falling ceiling tiles indicated a structural problem with the roof, "without any factual basis and despite the fact that it took a professional contractor inspecting the problem to ascertain that some of the trusses supporting the roof were separating." Trial Court Opinion, 1/30/02, at 5. This finding is supported by evidence presented in the underlying coverage litigation, as well as the parties' stipulations in the instant case, which reflect no indication of the Zimmermans' prior knowledge of the imminence of collapse prior to the date when Harleysville assumed its coverage.

¶ 17 The trial court further found that Harleysville decided to advance a "loss in progress" theory for denying coverage, despite the lack of Pennsylvania case law on this point, **and without observing its concomitant duty to protect the Zimmermans**. In support of this finding, the trial court emphasized that Harleysville did not consider a "joint loss payment" to protect its insured during the litigation process. *See* Trial Court Opinion, 1/30/02, at 3 (Finding of Fact No. 2, 3). The evidence of record also reflects that Harleysville's counsel recommended consideration of such an arrangement in his letter to Harleysville dated November 3, 1993. *See* Defendant's Exhibit "Y" at 17–18. Harleysville declined to follow the recommendation of its own counsel.

¶ 18 The trial court pointed out that, in the underlying coverage litigation, Harleysville "made numerous exaggerations and misstatements in their briefs and court statements[.]" *See* Trial Court Opinion, 1/30/02, at 4 (Finding of Fact No. 4). Moreover, the trial court found that "Harleysville, knowing of its insured's financial difficulties as a result of the loss, did nothing to protect the Zimmermans while it pursued a legal position not recognized by Pennsylvania courts." *Id.* These findings are supported in the record.

¶ 19 Thus, the Zimmermans established that "the insurer did not have a reasonable basis for denying benefits under the policy

and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim." *O'Donnell,* 734 A.2d at 906. Harleysville's "lack of diligence and slacking off," and its "willful rendering of imperfect performance," are further exemplified by its continued pursuit of its claim that the Zimmermans knew or should have known about the structural damage to the roof, despite the lack of any supporting evidence. *See Kaplan,* 671 A.2d at 722; *Zimmerman,* slip op. at 10, 12. Thus, the evidence, as set forth above, supports the trial court's determination that the Zimmermans established their claim of bad faith against Harleysville. Accordingly, we affirm this determination by the trial court.

■ ¶ 20 Harleysville also claims that the trial court erred when it concluded that a finding of bad faith *per se* was a sufficient basis for the award of punitive damages. However, in *Hollock v. Erie Ins. Exchange,* 842 A.2d 409 (Pa.Super.2004) an *en banc* panel of this Court held that a finding of bad faith permits an award of punitive damages "without additional proof, subject to the trial court's exercise of discretion." *Id.* at 419. In *Hollock,* this Court explained its rationale as follows:

> Section 8371, which creates the cause of action for insurance bad faith, specifically empowers the trial court to award punitive damages 'if the court finds that the insurer has acted in bad faith toward the insured[.]' 42 Pa.C.S.A. § 8371. The statute provides no other language suggesting a pre-condition for the award of punitive damages. Thus, by statutory mandate, a finding of bad faith is the only prerequisite to a punitive damages award under section 8371. Moreover,

this Court has suggested that the elements of proof necessary to establish a claim for punitive damages under this section are co-extensive with those that establish the bad faith claim itself. This is not incongruous, given the similarity in elements required for a common law claim of punitive damages to those required to show statutory bad faith.

*Id.* at 418–19 (citations omitted). Accordingly, the trial court's prior finding of bad faith was sufficient to permit it to award punitive damages, within its sound discretion. Because we discern no abuse of discretion by the trial court,[9] we affirm the trial court's award of punitive damages.

■ ¶ 21 In their cross-appeal, the Zimmermans claim that the trial court erred by giving Harleysville credit for the interest it had already paid in the coverage dispute. *See* Brief for the Zimmermans at 42. We disagree.

■ ¶ 22 Pursuant to section 8371 of title 42, "a court may award interest, attorney's fees and costs where the insurer has been found to have acted in bad faith towards its insured." *Birth Center v. St. Paul Companies, Inc.,* 727 A.2d 1144, 1160 (Pa.Super.1999). However, such an award is within the discretion of the trial court. *Id.* at 1161. "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Paden v. Baker Concrete Constr.,* 540 Pa. 409, 658 A.2d 341, 343 (1995). When determining whether the trial court abused its discretion, "[t]he test is not whether we would have reached

---

**9.** Specifically, the trial court's Findings of Fact Nos. 1, 2, 6, 7, and 8, which are supported by the evidence, provide ample evidence of Harleysville's bad faith. *See* Trial Court Opinion, 1/30/02, at 3–4.

the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion." *Terletsky v. Prudential Property and Cas. Ins. Co.*, 437 Pa.Super. 108, 649 A.2d 680, 686 (1994).

¶ 23 Here, the trial court exercised its discretion and awarded the Zimmermans interest, but decided to grant Harleysville a credit for interest it already had paid to the Zimmermans. After reviewing the record, and keeping in mind the trial court's award of damages and the interest already paid by Harleysville, we cannot conclude that the trial court abused its discretion in this regard. Accordingly, the Zimmermans are not entitled to relief on this claim.

¶ 24 Judgment affirmed.

¶ 25 Judge JOYCE files Dissenting Opinion.

DISSENTING OPINION BY JOYCE, J.:

¶ 1 While my esteemed colleagues have undertaken a thorough analysis of the issues at bar, I disagree with the conclusion that the Zimmermans proved by clear and convincing evidence that Harleysville Mutual Insurance Company acted in bad faith when it denied their claim. Accordingly, I dissent.

¶ 2 Harleysville asserts five grounds for its first claim that it had a "reasonable basis to deny, defend, and appeal the insurance claim." Appellant's Brief, at 21. Harleysville's first ground is that, under these facts, "the general rule [i.e., the manifestation rule] applied by most courts in property insurance cases provided a reasonable basis to conclude that Harleysville did not provide coverage." *Id.* The rule, Harleysville explains, "provides that

manifestation occurs at that point in time when appreciable damage occurs and is or should be known to the insured, such that a reasonable insured would be aware that his notification duty under the policy has been triggered." *Id.* at 22. Applied instantly, Harleysville contends:

> [t]he "manifestation" occurred during the Fireman's Fund policy term because: (a) appreciable damage occurred in the form of falling ceiling tiles; (b) the falling ceiling tiles were known to the Zimmermans; and (c) the Zimmermans were aware that their notification duty was triggered as they notified their insurance agent about the falling ceiling tiles during the effective dates of the Fireman's Fund policy.

*Id.* Harleysville cites to non-Pennsylvania cases, primarily *Prudential–LMI Commercial Insurance v. Superior Court*, 51 Cal.3d 674, 274 Cal.Rptr. 387, 798 P.2d 1230 (1990), in support of this manifestation rule.

¶ 3 The Majority concluded that Harleysville acted in bad faith as it did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim. As the finding of bad faith was, in most part, based upon Harleysville's position that the collapse of the bowling alley roof was a "loss in progress" and, therefore, was not covered under its policy period, an examination of the law in this area is warranted.

¶ 4 Broadly speaking, after an insurance policy is issued, coverage under that policy must be "triggered." Various theories exist as to when a "triggering" occurs. *See, e.g., Consulting Eng'rs, Inc. v. Ins. Co. of N. Am.*, 710 A.2d 82, 87 (Pa.Super.1998) (rejecting "multiple trigger" theory under the facts). Where successive insurance carriers are involved, determining when

coverage is triggered becomes particularly important.

¶ 5 One such theory is the "manifestation trigger." For example, coverage is triggered under an occurrence type liability insurance policy "when the injurious effects of the negligent act *first manifest themselves* in a way that would put a reasonable person on notice of the injury." *D'Auria v. Zurich Ins. Co.*, 352 Pa.Super. 231, 507 A.2d 857, 861 (1986). By way of corollary, in a property insurance context, coverage is triggered when the property damage first manifests itself—presumably in a manner "that would put a reasonable person on notice of the [damage]." *Id.*

¶ 6 It has been posited that the "manifestation" theory complements the "known loss" or "loss in progress" theory. *See Prudential–LMI Commercial Ins. v. Superior Court*, 51 Cal.3d 674, 274 Cal.Rptr. 387, 798 P.2d 1230, 1246–47 (1990); 7 Lee R. Russ, Couch on Insurance § 102:9 (3d ed.1995).[10] The "known loss" doctrine, as defined by our Supreme Court, states: "that one may not obtain insurance for a loss that either has already taken place or is *in progress.*" *Rohm and Haas Co. v. Cont'l Cas. Co.*, 566 Pa. 464, 781 A.2d 1172, 1176 (2001) (citation omitted) (emphasis supplied).[11] Thus, if property damage manifested itself prior to or was in progress at the time insurance coverage commenced, the insurer may argue that the "manifestation" occurred outside the scope of its coverage under the Pennsylvania

interpretation of the "known loss" doctrine.

¶ 7 I disagree with the trial court's finding that Harleysville acted in bad faith in denying the Zimmerman's claim based on (a) that the facts did not support the invocation of the manifestation theory; and (b) that "it was apparent" that the "loss in progress" theory lacked legal support. My primary disagreement is with the manner in which the trial court arrived at its conclusion. I secondarily note our Supreme Court's later adoption of the "known loss" doctrine and the *Zimmerman I* court's unexplained application of a third-party liability insurance analysis to the instant first-party property insurance policy.

¶ 8 The bad faith trial court's analysis is predicated on the *Zimmerman I* court's rejection of Harleysville's "loss in progress" theory of defense. According to the trial court, Harleysville, therefore, acted in bad faith by even presenting this defense in the first place. The flaw in this conclusion lies in the fact that the viability of this defense was not rejected by our courts *until* the underlying coverage litigation. Certainly, Harleysville cannot be faulted for pursuing what it believed to be a potentially viable legal theory in light of the facts specific to this case simply because the issue was ultimately resolved in favor of the Zimmermans.

---

**10.** We recognize that state and federal courts disagree on whether the "known loss" and "loss in progress" doctrines are separate or identical doctrines.

**11.** The *Rohm and Haas* court's definition seemingly considers these doctrines as identical. We note one commentator's discourse:

The loss in progress doctrine is generally articulated in terms of the insurer not being liable if a loss was already in progress before the policy's coverage took effect.

While the term "known loss" would, on its face, appear to indicate that the loss has actually occurred, and has been so interpreted, most courts articulate this doctrine to include both actual losses that have occurred by the time the insurance is effected, and losses which are "substantially certain to occur" or which were a "substantial probability" or some equivalent statement. 7 Lee R. Russ, Couch on Insurance § 102:8 (3d ed.1995) (footnotes omitted).

¶ 9 The *Zimmerman I* court rejected Harleysville's "loss in progress" defense on the basis of our holding in *D'Auria, supra.* The *Zimmerman I* court concluded, based on *D'Auria,* that "Pennsylvania law provides clear authority for determining liability when damages occur over time and under different insurers. In the absence of ambiguity in this area of the law, we decline [Harleysville's] invitation to adopt the 'loss in progress' doctrine of other jurisdictions...." *Zimmerman I,* slip op. at 9 (footnote omitted). The *Zimmerman I* court considered Harleysville's theory, decided that it was foreclosed by prior Pennsylvania law, and, therefore, rejected it.

¶ 10 Harleysville could not have known it was acting in bad faith by presenting a reasonable but heretofore unrecognized defense, as opposed to one previously rejected by our courts.[12] *Cf. J.H. France Refractories Co. v. Allstate Ins. Co.,* 534 Pa. 29, 626 A.2d 502, 510 (1993) (commenting, "[i]t would be harsh indeed to attribute bad faith to parties which relied on the reasoning and approaches that other courts have found convincing, when there had been no definitive precedent in this jurisdiction."). I therefore disagree with the trial court's conclusion that "[i]t was apparent that the defendant's legal position was tenuous." Trial Court Op., slip op. at 6. This was, as Harleysville asserts, a "legitimate coverage issue" that required litigation as to its belief that the Zimmermans' claims were not covered.

¶ 11 I further note that our Supreme Court adopted the "known loss" doctrine in *Rohm and Haas Co. v. Continental Cas. Co.,* 566 Pa. 464, 781 A.2d 1172, 1177 (2001). While the Zimmermans contend that *Rohm and Haas* is factually distinguishable from the instant case, our Supreme Court's adoption of this theory is suggestive that Harleysville did not act in bad faith by presenting it at the underlying coverage litigation. As previously discussed, it appears that our Supreme Court has defined "known loss" to encompass a "loss in progress." Other courts have also adopted the "manifestation" and "loss in progress" theories. *See, e.g., Bostick v. ITT Hartford Group, Inc.,* 56 F.Supp.2d 580, 585 (E.D.Pa.1999) (commenting that "if a deterioration problem [that resulted in collapse of wall] occurred prior to the effective date of a policy, an insurer would not be held liable for ongoing damage that began before the insurer's policy period."); *Winding Hills Condo. Ass'n, Inc. v. N. Am. Specialty Ins. Co.,* 332 N.J.Super. 85, 752 A.2d 837, 840 (App.Div.2000) (concluding "that the manifest-trigger rule remains appropriate in first-party property damage claims for a variety of reasons.").

¶ 12 Finally, I note that *D'Auria* addressed a different issue: whether the insurers had a duty to defend the insured, a medical doctor, against third parties when the alleged acts of malpractice occurred before the insurers' coverage began. The *D'Auria* insurers provided "occurrence" type liability policies.[13] The *D'Auria* court, in defining "occurrence" in that context, adopted the "cause" and "effect" test of *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.,* 676 F.2d 56 (3d Cir.1982).[14]

---

**12.** I do not, by any means, suggest that an insurer, by presenting a defense previously rejected by Pennsylvania courts, acts in bad faith *per se.*

**13.** "An 'occurrence' policy protects the policyholder from liability for any act done while the policy is in effect...." *D'Auria v. Zurich Ins. Co.,* 352 Pa.Super. 231, 507 A.2d 857,

858 (1986) (quoting *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 535 n. 3, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978)).

**14.** The *D'Auria* court explained the "cause" and "effect" test as follows:

The general rule is that an occurrence is determined by the cause or causes of the

In many insurance contexts ranging from principles of causation, to the varied post-loss duties addressed here, the courts recognize the conceptual and practical difference between—

• "First party" insurance, which is a contract between the insurer and insured protecting the insured's own actual losses and expenses, such as property insurance, fidelity insurance, and medical/health insurance.

• "Third party" insurance, which is a contract to protect the insured from actual or potential monetary liability to a third party, such as liability insurance.

14 LEE R. RUSS, COUCH ON INSURANCE § 198:3 (3d ed.1995) (footnote omitted); *accord Port Auth. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233–34 (3d Cir.2002) (considering New Jersey case); *Anthem Elecs., Inc. v. Pac. Employers Ins. Co.*, 302 F.3d 1049, 1054 (9th Cir.2002) (interpreting California law); *see also* 7 LEE R. RUSS, COUCH ON INSURANCE § 101:58 (3d ed.1995).

¶ 13 Harleysville, in the underlying coverage litigation, did not consider *D'Auria* applicable as *D'Auria* addressed an insurer's duty to defend the insured against third parties under an "occurrence" type liability insurance policy, whereas the instant case concerned an insurer's allegedly "bad faith" failure to pay a claim under the insured's first-party property insurance policy. The November 3, 1993 letter from Harleysville's retained counsel states in pertinent part:

Our investigation and research of relevant legal authority in regard to [this] claim has been completed. It is interesting to note that this appears to be a case of first impression in Pennsylvania. Nonetheless, the loss for which the insureds seek indemnity, was in progress at the inception of the Harleysville policy and therefore did not result from a fortuitous event.

. . . .

The coverage afforded by any policy of liability or property insurance is generally "triggered" by an occurrence. Though integral to any contract of insurance, most policies do not expressly define an "occurrence".[15] *Additionally, the meaning of an "occurrence" differs in the context of liability and property insurance.*

*There is a paucity of reported authority addressing the definition of occurrence in its application to property policies. No Pennsylvania case law was found.* However, the few courts that have interpreted the term as used in this context, have done so by utilizing a comparative analysis to the term as used in liability coverage. . . .

. . . .

resulting injury. "[T]he majority of jurisdictions [employ] the 'cause theory'. . . . . Using this analysis, the court asks if '[t]here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage.' " [citing *Appalachian*, 676 F.2d at 61.]

. . . .

We adopt the "cause of the loss" test in the instant case to determine the number of "occurrences" present in [the insured's] complaint.

*D'Auria*, 507 A.2d at 860.

**15.** The instant policy defined "occurrence" under the liability section as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Zimmerman v. Harleysville Mut. Ins. Co., et al.*, No. 10103–1993, slip op. at 5 (C.P. Pa. June 30, 1995) (citation omitted). "Occurrence" was "not defined in the property portion of the policy. . . ." *Zimmerman v. Harleysville Mut. Ins. Co., et al.*, No. 10103–1993, slip op. at 3 (C.P.Pa. Aug. 13, 1996). The trial court employed the liability section definition of occurrence, reasoning that insurance policies are interpreted in accordance with contract principles. *See id.*

...Hence, while the cause of a loss constitutes an occurrence for purposes of *liability* coverage,[16] *the actual manifestation of damage is the occurrence for which property insurance affords coverage.*[17]

The ascertainment of an occurrence becomes particularly critical where, as in the instant claim, an insured sustains a continuous or protracted loss.

Def.'s Trial Ex. Y, at 5–6, (emphasis supplied); *see also* Def.'s Trial Ex. Q1, at 2, (noting, in a letter discussing whether to appeal the adverse trial court coverage litigation verdict, "[t]he [coverage trial judge's] obvious confusion between liability and property coverages and his improper analysis of this property claim under the liability portion of the policy....").

¶ 14 The *Zimmerman I* court disagreed, relying on the *D'Auria–Keystone–Appalachian* "cause" and "effect" test in rejecting the concept that the "occurrence," or manifestation of damage that led to the collapse of the roof, took place during the Fireman's Fund coverage. *D'Auria, Keystone,* and *Appalachian* all addressed third-party liability insurance policies. The instant case concerned a first-party property insurance policy. Although we agree that certain analytical principles may apply to issues involving both first-party and third-party insurance policies, the *Zimmerman I* court chose not to explain its reasoning in following the *Keystone* court's "suggestion" in applying *D'Auria* to the underlying action. *See Zimmerman I,* slip op. at 8 n. 11; *see also Cain Village Assocs., L.P. v. Home Indem. Co.,* 75 F.Supp.2d 404, 411 (E.D.Pa.1999) (applying *D'Auria* test, without explanation, to a first-party property insurance policy).[18] This lack of explanation would seem crucial since the distinction was a controlling factor in Harleysville's chosen course of conduct.

¶ 15 Additionally, the Majority found that Harleysville acted in bad faith since it pursued its "loss in progress" position "without observing its concomitant duty to protect the Zimmermans" because it did not consider a joint loss payment to protect the Zimmermans during the litigation. Majority opinion, at 173. However, there is no requirement under the law that Harleysville tender such a payment in the face of what it believed to be a non-recoverable event. While it is true that Harleysville's counsel did suggest a joint loss payment, counsel also alternatively suggested a de-

**16.** *But see D'Auria,* 507 A.2d at 862 (explaining, "an 'occurrence' happens when *injury* is reasonably apparent, *not* at the time the *cause* of the injury occurs.").

**17.** The conclusion was based upon a discussion and analysis of *Newmont Mines, Ltd. v. Hanover Ins. Co.,* 784 F.2d 127 (2d Cir.1986).

**18.** Indeed, some commentators have cautioned against such intermingling.

Many states have court decisions addressing trigger of coverage for third-party liability claims. Although a trigger-of-coverage analysis for both third-party and first-party claims focuses on when a loss occurs for purposes of coverage, it must be kept in mind that first-party property coverage concepts and coverage concepts applying to third-party liability claims are entirely different.

. . . .

Applying the reasoning used for triggers of coverage in third-party claims to a first-party loss should be avoided or at least approached with caution because there are significant differences between the two types of coverage.

Paula B. Tarr, William S. Daskam IV, Herbert J. Baumann, Jr., *Insurance Coverage for Collapse Claims: Evolving Standards and Legal Theories,* 35 Tort and Ins. L.J. 57, 78 (1999); *see also* Chandra Lantz, Note, *Triggering Coverage of Progressive Property Loss: Preserving the Distinctions Between First- and ThirdParty Insurance Policies,* 35 Wm. & Mary L. Rev. 1801 (1994).

claratory judgment action as a course to pursue, which is precisely what occurred. Def.'s Trial Ex. Y, at 17–18.

¶ 16 In sum, I disagree that Harleysville acted in bad faith in denying coverage on the basis that the claim was a "loss in progress" in light of Harleysville's then-accurate belief that no countervailing Pennsylvania authority existed. That this Court disagreed with Harleysville's legal position and our Supreme Court dismissed the appeal after briefing and oral arguments (over the dissent of two justices) does not justify a finding of "bad faith." Reasonable theories would perish for fear of suffering a title 42, section 8371 imposition of punitive damages. Under these circumstances, I would find that Harleysville was, at worst, reasonably mistaken in concluding *D'Auria* did not apply, or conversely, that *Prudential–LMI* should apply. Accordingly, I would reverse the order of the Court of Common Pleas and direct that a verdict be entered in favor of Harleysville.