928 A.2d 186

**Georgina TOY, Appellant/Cross–Appellee,**

**v.**

**METROPOLITAN LIFE INSURANCE COMPANY
and Bob Martini, Appellees/Cross–Appellants.**

Supreme Court of Pennsylvania.

Argued Feb. 28, 2006.

Decided July 18, 2007.

22

Kevin P. Allen, Esq., Brian John Pendleton, Jr., Esq., Pittsburgh, for Metropolitan Life Insurance Company and Bob Martini.

James Michael Beck, Esq., Philadelphia, for amicus curiae Product Liability Advisory Council, Inc.

Patricia Hale Becker, Esq., for amicus curiae American Council of Life Insurers.

Kenneth Robert Behrend, Esq., Pittsburgh, for Georgiana Toy.

Michael D. Donovan, Esq., David A. Searles, Esq., Philadelphia, for amicus curiae National Consumer Law Center, et al.

BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

24

## *OPINION*

Chief Justice CAPPY.

In this civil action, Appellant/Cross–Appellee Georgina Toy ("Toy") brought several causes of action against Appellees/Cross–Appellants Metropolitan Life Insurance Company ("Metropolitan Life") and one of its sales representatives, Bob Martini ("Martini") (collectively, "Defendants"). We granted review to consider (1) the purview of the bad faith statute, 42 Pa.C.S. § 8371 (" § 8371"); (2) whether justifiable reliance is an element of the claims Toy brought under the Unfair Trade Practices and Consumer Protection Law ("Consumer Protection Law"), 73 P.S. § 201–1 *et seq.*;[1] and (3) whether Defendants were entitled to summary judgment on the grounds that Toy would be unable to establish the element of justifiable reliance at trial. For the following reasons, the Superior Court's order is affirmed, though as a matter of statutory construction on Toy's § 8371 claim.[2]

### I.

#### A. *Facts*

The relevant record on summary judgment, based on Toy's deposition testimony, is as follows.[3] In February of 1992, Toy

1. Toy's Consumer Protection Law claims accrued and were brought under the statute that was in effect prior to the amendments the Legislature made to the statute in 1996. *See* Dec. 4, P.L. 906 No. 146, § 1, effective in 60 days. Therefore, all of the references made in this opinion to the Consumer Protection Law concern the statute that governs Toy's claims.

2. This case is one of approximately 200 cases ("Cases") that remain pending against Metropolitan Life and its sales representatives in the Court of Common Pleas of Allegheny County, which raise many of the same allegations. In 1996, under Rule 249(IV) of the Allegheny County Local Rules of Court, the Cases were designated complex and assigned to a single judge, the Honorable R. Stanton Wettick.

3. We note that Toy did not raise whether Defendants' Motion for Summary Judgment, in relying on Toy's deposition testimony, violated

was 42 years of age and working as a registered nurse, a position she had held for about twenty years. Toy and her husband owned a small business and their own home. Through her employment, Toy held a tax-sheltered annuity and a life insurance policy. Toy wanted to begin preparing for retirement. Toy's husband, who was acquainted with Martini, arranged for a meeting between Martini and Toy so that they could discuss a product that Metropolitan Life offered. At their meeting, Martini presented Toy with information regarding the Metropolitan Life 50/50 Savings Plan. Martini explained that the plan was a savings vehicle and that if Toy were to make monthly payments of $50, the plan would generate a fund of approximately $100,000 when she reached sixty-five. Martini also informed Toy that life insurance went along with and was part of the plan. When Toy indicated to Martini that she was interested in the plan, he had her complete and execute an "Application for Life Insurance," which asked a series of questions concerning lifestyle and health.

The following month, Toy received a policy of insurance ("Policy") from Metropolitan Life. The cover sheet of the Policy had the following information written on it: "Metropolitan Life Insurance Company will pay the amount of insurance and provide the other benefits of this policy according to its provisions"; "Insured Georgina M. Toy"; "Face Amount of Insurance $31,544 as of Feb. 10, 1992"; "Policy Number 925 001 595 A;" "Plan Whole Life"; "Whole Life Policy"; "Life insurance payable when the insured dies"; "Premiums payable for a stated period"; and "Annual dividends." The cover sheet also displayed a "10–Day Right to Examine Policy," which stated:

the rule announced in *Borough of Nanty–Glo v. American Surety Co. of New York*, 309 Pa. 236, 163 A. 523 (1932). *See Penn Center House, Inc. v. Hoffman*, 520 Pa. 171, 553 A.2d 900, 903 (1989) (Testimonial affidavits of the moving party or his witnesses, not documentary, even if uncontradicted, will not afford sufficient basis for the entry of summary judgment, since the credibility of the testimony is still a matter for the jury.) (quotation omitted).

Please read this policy. You may return the policy to Metropolitan or to the sales representative through whom you bought it within 10 days from the date you receive it. If you return it within the 10–day period, the policy will be void from the beginning. We will refund any premium paid.

(Defendants' Motion for Summary Judgment, Exhibit C.)

On page 4, the Policy set forth a guaranteed cash value at age 65 of $11,008.86 based on a guaranteed interest rate of 4% a year. On page 8, the Policy stated that "[t]his policy includes any riders and, with the application attached when the policy is issued, makes up the entire contract." The Policy also set forth a "Limitation on Sales Representative's Authority," providing that "[n]o sales representative or other person, except our President, Secretary, or a Vice–President may (a) make or change any contract of insurance; or (b) change or waive any terms of this policy. Any change must be in writing and signed by our President, Secretary or a Vice–President." (*Id.*)

Toy looked at only the Policy's cover sheet. Over time, Toy paid a total of $1,400 in premiums to Metropolitan Life. In 1994, Toy was notified of a Florida class action pending against Metropolitan Life, and became concerned that she had purchased life insurance from the Company. At that point, Toy stopped making premium payments, and the Policy lapsed.

## B. *Procedural History*

Toy filed a Praecipe for Writ of Summons on November 1, 1995, a complaint on February 6, 1996, and an amended complaint ("Complaint") on March 3, 1999 against Defendants. In her Complaint, Toy alleged that Defendants undertook a marketing scheme to disguise the true nature of the Policy and misrepresent it to be a savings or investment vehicle; that Defendants' misrepresentations about the Policy led her to believe that she was investing in a savings plan; that due to Defendants' misrepresentations she purchased life insurance she did not want; that Defendants' misrepresentations prevented her from securing the type of retirement product she

needed; and that Defendants engaged in these practices because the premiums and administrative fees associated with life insurance were higher than those for annuities and similar retirement products. Based on these allegations, Toy set forth, *inter alia*, claims under the Consumer Protection Law against Defendants (Count III and Count IV),[4] and a claim for bad faith under § 8371[5] against Metropolitan Life for engag-

**4.** The Consumer Protection Law defines "unfair methods of competition" and "unfair or deceptive acts or practices" in the conduct of trade or commerce, and declares them to be unlawful. 73 P.S. § 201-3. The statute creates a private right of action in persons upon whom unfair methods of competition and unfair or deceptive acts or practices are employed and who as a result, sustain an ascertainable loss. 73 P.S. § 201-9.2. The Consumer Protection Law lists specific unfair methods of competition and unfair or deceptive acts or practices, and includes a catchall provision. 73 P.S. § 201-2(4)(i)-(xvii). In her Complaint, Toy alleged that the Defendants committed the following prohibited practices and violated the catchall provision:

§ 201-2 Definitions
As used in this act.

\*　　\*　　\*

(4) "Unfair methods of competition" and "unfair or deceptive acts or practices" mean any one or more of the following:

\*　　\*　　\*

(ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

\*　　\*　　\*

(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have. . . .

\*　　\*　　\*

(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

\*　　\*　　\*

(xvii) Engaging in any other fraudulent conduct which creates a likelihood of confusion or misunderstanding.
73 P.S. §§ 201-2(4)(ii),(v),(vii), and former (xvii).

**5.** The bad faith statute provides:

§ 8371. Actions on insurance policies
In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
(2) Award punitive damages against the insurer.

ing in activity that is unlawful under the Unfair Insurance Practices Act ("UIPA"), 40 P.S. § 1171.1 *et seq.* (Count VI).[6,7]

In the interval between the commencement of Toy's action and the filing of her Complaint, the trial court made several rulings in one of the Cases, *Ihnat v. Pover,* 35 Pa.D. & C.4th

> (3) Assess court costs and attorney fees against the insurer.
> 42 Pa.C.S. § 8371.

6. The UIPA prohibits persons from engaging in an unfair method of competition or an unfair or deceptive act or practice in the business of insurance. 40 P.S. § 1171.4. The Insurance Commissioner of the Commonwealth of Pennsylvania enforces the UIPA, and is empowered to impose administrative and civil penalties and injunctions upon insurers who violate its provisions. 40 P.S. §§ 1171.9, 1171.10, 1171.11.

> The UIPA unfair methods of competition and unfair or deceptive acts or practices that Toy alleged constitute Metropolitan Life's bad faith conduct under § 8371 are:
> § 1171.5 "Unfair methods of competition" and "unfair or deceptive acts or practices" defined
> (a) "Unfair methods of competition" and "unfair or deceptive acts or practices" in the business of insurance means:
> (1) Making, publishing, issuing or circulating any estimate, illustration, circular, statement, sales presentation, omission comparison which:
> (i) Misrepresents the benefits, advantages, conditions or terms of any insurance policy;
>
> &ast; &ast; &ast;
>
> (2) Making, issuing, publishing or circulating in any manner an advertisement, announcement or statement containing any representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business which is untrue, deceptive or misleading.
>
> &ast; &ast; &ast;
>
> (10)(vii) Compelling persons to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such persons;
>
> &ast; &ast; &ast;
>
> (12) Making false or fraudulent statements or representations on or relative to an application for an insurance policy, for the purpose of obtaining a fee, commission, money or other benefit from any insurers, agent, broker or individual.
> 40 P.S. § 1171.5(a)(1)(i),(2),(10)(vii),(12).

7. Toy also asserted claims for common law fraud and negligent misrepresentation against Defendants (Counts I and II, respectively), and a claim for negligent supervision against Metropolitan Life (Count V). These claims are not at issue in these appeals.

120 (Pa.Com.Pl.1997). These rulings were applied in all of the Cases, where relevant.[8] One such ruling concerned the scope of the bad faith statute. The trial court ruled that bad faith under § 8371 was not, as Metropolitan Life argued, limited to allegations that an insurer refused to cover claims, but could be founded on allegations that the insurer did not satisfy a duty that the law imposed upon it in its relationship with its insured. *Id.* at 139–40. The trial court reasoned that § 8371 is written broadly; that the only restriction reflected in its language is that it does not reach conduct that is otherwise permissible to insurers under Pennsylvania law; that the court should not read a remedial statute narrowly; and that the Legislature was creating a comprehensive remedy for fraudulent conduct and violations of all UIPA provisions in enacting § 8371, and not merely responding to this Court's refusal in *D'Ambrosio v. Pennsylvania National Mutual Casualty Ins. Co.*, 494 Pa. 501, 431 A.2d 966 (1981), to adopt the approach taken by the California Supreme Court in *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973), and create a remedy for an insured who alleged that his insurer acted in bad faith in denying payment for a loss covered under the parties' insurance contract. *Ihnat*, 35 Pa.D. & C.4th at 126–31.

The trial court then articulated two requirements that an insured must meet in order to prevail on a bad faith claim. First, the insured must establish that the insurer breached a known duty; and second, the insured must establish that the insurer acted out of a motive of self-interest or ill will. *Id.* at 132. In the trial court's view, the former could be established by showing that the insurer engaged in practices that constitute common law fraud or UIPA violations. *Id.* at 139–40.

On May 23, 2003, Defendants filed a motion for summary judgment, seeking judgment on all of the Counts in Toy's Complaint. As to Toy's bad faith claim, Metropolitan Life's

8. When initially assigned the Cases, see *supra* n. 2, Judge Wettick held a status conference during which counsel identified nineteen issues that the Cases had in common. Judge Wettick addressed four of those issues in *Ihnat*, which were raised in preliminary objections that Defendants filed in the Cases.

starting point was the trial court's ruling in *Ihnat.* Metropolitan Life asserted that inasmuch as justifiable reliance is an element of common law fraud, it necessarily followed from the trial court's construction of § 8371 that justifiable reliance was likewise an element of a bad faith claim. Metropolitan Life then repeated the argument that Defendants made in support of their entitlement to summary judgment on any of Toy's claims that were based on Martini's alleged misrepresentations: that Toy could not prove the element of justifiable reliance. In addition, Metropolitan Life set forth the argument it had made in *Ihnat* that the bad faith statute is limited to a claim that an insurer failed to provide an insured with the benefits or coverage that his insurance policy provided. As to Toy's claims brought under the Consumer Protection Law, Defendants contended that here too, Toy's inability to establish justifiable reliance entitled them to summary judgment since under this Court's decision in *Weinberg v. Sun Co., Inc.,* 565 Pa. 612, 777 A.2d 442 (2001), justifiable reliance was an element of her Consumer Protection Law claims.

The trial court agreed with Defendants that in light of its construction of § 8371 in *Ihnat,* justifiable reliance was an element of Toy's bad faith claim, and that under *Weinberg,* justifiable reliance was also an element of her Consumer Protection Law claims. The trial court also agreed with Defendants that Toy was unable to prove that she justifiably relied on Martini's alleged misrepresentations about the Policy, and thus, were entitled to summary judgment on all of the causes of action in the Complaint that required such a showing. For the trial court, the discrepancy between the Policy's cover sheet and the misrepresentations Toy alleged Martini made about the Policy and its terms led to this conclusion. The trial court stated:

> The cover sheet of the insurance policy placed Toy on notice that there appeared to be a discrepancy between the representations of Mr. Martini and the terms of the written agreement between the insurance company and plaintiff. Consequently, plaintiff could no longer rely on Mr. Martini's representations, the falsity of which would have been patent

to plaintiff though a cursory review of only the first page of the document that MetLife delivered to her.

(Trial Court's Opinion at 41–42) (footnote omitted). In addition, the trial court ruled that the parol evidence rule barred all of Toy's misrepresentation-based claims. Accordingly, by Order dated December 8, 2003, the trial court granted Defendants' Motion for Summary Judgment, and dismissed Toy's § 8371 and Consumer Protection Law claims with prejudice.[9]

Toy brought a timely appeal in the Superior Court from the trial court's order. In a published opinion, the Superior Court affirmed the trial court's order as to Toy's § 8371 claim, and reversed the trial court's order as to Toy's Consumer Protection Law claims. *Toy v. Metropolitan Life Insurance Co.*, 863 A.2d 1 (Pa.Super.2004).

With respect to Toy's § 8371 claim, the Superior Court did not discuss the basis of the trial court's decision, namely, its construction of the bad faith statute to encompass instances of insurer fraud or unfair trade practices. Rather, the Superior Court disagreed with the two elements that the trial court stated an insured who asserts a bad faith claim must show, *see supra* p. 7–8, and reiterated its view that the requisite elements of a bad faith claim are that the insurer refused to provide benefits and knew or recklessly disregarded that it lacked a reasonable basis for the refusal. *Id.* at 14 (quoting *Booze v. Allstate Ins. Co.*, 750 A.2d 877, 880 (Pa.Super.2000)). Since Toy's bad faith claim did not include these elements, the Superior Court held that it was properly dismissed. *Id.* at 14–15.

As to all of Toy's claims that depended upon proof that Martini made misrepresentations about the Policy, the Superior Court held that the trial court erred in concluding that they were barred by the parol evidence rule, concluding that Toy's

9. The trial court's December 8, 2003 Order dismissed all of Toy's claims with prejudice. The trial court also ruled that that Toy's fraud, negligent misrepresentation, and negligent supervision claims were barred under the two-year statute of limitations, 42 Pa.C.S. § 5524(7), and that the negligent supervision claim could not proceed because Martini was not acting outside the scope of his employment.

allegations fell within one of the rule's exceptions. Reasoning that Toy essentially sought to prove that due to Defendants' fraudulent conduct, the Policy that she agreed to purchase omitted certain savings and investment features, the Superior Court determined that the Toy's claims could proceed under the fraud in the execution of a contract exception to the parol evidence rule that this Court has recognized. *Id.* at n. 4. *See Bardwell v. Willis Co.*, 375 Pa. 503, 100 A.2d 102, 104 (1953).

With regard specifically to Toy's Consumer Protection Law claims, the Superior Court reviewed this Court's decision in *Weinberg*, and determined that the trial court correctly required Toy to demonstrate the element of justifiable reliance. 863 A.2d at 9–11. Unlike the trial court, however, the Superior Court concluded that the record did not entitle Defendants to summary judgment. Based on Sections 540 and 541 of the Restatement (Second) of Torts [10] and cases in which it had

---

**10.** These Sections provide:

§ 540. Duty to Investigate

The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.

Comment: ·

a. The rule stated in this Section applies not only when an investigation would involve an expenditure of effort and money out of proportion to the magnitude of the transaction, but also when it could be made without any considerable trouble or expense. Thus it is no defense to one who has made a fraudulent statement about his financial position that his offer to submit his books to examination is rejected. On the other hand, if a mere cursory glance would have disclosed the falsity of the representation, its falsity is regarded as obvious under the rule stated in § 541.

Restatement (Second) of Torts § 540 and Comment a.

§ 541. Representation Known to Be or Obviously False

The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.

Comment:

Thus, although the recipient of a fraudulent misrepresentation is not barred from recovery because he could have discovered its falsity if he had shown his distrust of the maker's honesty by investigating its truth, he is nonetheless required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.

Restatement (Second) of Torts § 541 and Comment a.

been determined that an insured was not obligated to read a policy and discover that an agent had misstated the extent of insurance coverage, the Superior Court held that Toy's failure to review the Policy's cover sheet or Toy's receipt of a policy that made no mention of the savings plan she thought she had purchased, did not prohibit her from demonstrating that she justifiably relied on Martini's alleged misrepresentations. *Id.* at 12–13 (citing Restatement (Second) of Torts §§ 540, 541, *Rempel v. Nationwide Life Ins. Co.,* 471 Pa. 404, 370 A.2d 366, 368 (1977)(plurality), and *Pressley v. Travelers Prop. Cas. Corp.,* 817 A.2d 1131 (Pa.Super.2003)).

Toy and the Defendants filed Petitions for Allowance of Appeal, respectively. This Court granted Toy's Petition, limiting review to (1) whether the Superior Court's decision that a claim under § 8371 is limited to the unreasonable refusal by an insurance company to pay a valid claim conflicts with Pennsylvania law and the reasoned decisions of other appellate courts, and (2) whether the Superior Court's interpretation of the Consumer Protection Law to require justifiable reliance conflicts with the rules of statutory construction and contradicts the reasoned decisions of appellate courts in other jurisdictions that require a lesser standard of reliance to bring a claim under those States' consumer protection statutes. *Toy v. Metropolitan Life Insurance Co.,* 584 Pa. 133, 882 A.2d 462 (2005). This Court also granted Defendants' Petition as to whether the Superior Court's determination on the issue of Toy's justifiable reliance was erroneous, negating the express, clear and unambiguous terms of an insurance contract in favor of oral representations allegedly made prior to the issuance of the contract. *Id.* at 479.

## II.

Our analysis begins with our standard and scope of review. The Pennsylvania Rules of Civil Procedure that govern summary judgment instruct in relevant part, that the court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional

discovery. Pa.R.C.P. No. 1035.2(1). Under the Rules, a motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. Note to Pa.R.C.P. No. 1035.2.[11] In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Jones v. SEPTA*, 565 Pa. 211, 772 A.2d 435, 438 (2001). Finally, the court may grant summary judgment only where the right to such a judgment is clear and free from doubt. *Marks v. Tasman*, 527 Pa. 132, 589 A.2d 205, 206 (1991).

### A. The Bad Faith Statute

■ We turn first to Toy's issue with regard to the bad faith statute, which asks us to consider whether a bad faith claim within the meaning of § 8371 may be premised on allegations that an insurer engaged in deceptive or unfair conduct in soliciting the insured to purchase an insurance policy.

This issue is a question of statutory construction, which the Statutory Construction Act of 1972 ("Act") controls. 1 Pa.C.S. § 1501 *et seq.* Therefore, we begin with the provisions of the Act that guide us. Under the Act, it is fundamental that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). The Act instructs that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Signifi-

---

11. An appellate court may reverse the granting of a motion for summary judgment if there has been an error of law or an abuse of discretion. *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 571 Pa. 580, 812 A.2d 1218, 1221 (2002). As the issue as to whether there are no genuine issues as to any material fact presents a question of law, our standard of review is de novo; thus, we need not defer to the determinations made by the lower tribunals. Our scope of review, to the extent necessary to resolve the legal question before us, is plenary. *Buffalo Township v. Jones*, 571 Pa. 637, 813 A.2d 659, 664 n. 4 (2002); Pa.R.A.P. No. 2111(a)(2).

cantly, only when the words of the statute are not explicit, is the General Assembly's intent to be ascertained by considering matters other than statutory language, like the occasion and necessity for the statute; the circumstances of its enactment; the object it seeks to attain; and the consequences of a particular interpretation. 1 Pa.C.S. § 1921(c); *Commonwealth v. Packer*, 568 Pa. 481, 798 A.2d 192, 196 (2002). Lastly, the Act provides that "[w]ords and phrases shall be construed according to the rules of grammar and according to their common and approved usage"; but that "technical words and phrases and such others as have acquired a peculiar and appropriate meaning . . . shall be construed according to such peculiar and appropriate meaning or definition." 1 Pa.C.S. § 1903(a). The latter includes words or terms that have acquired a particular meaning in the law. *See Semasek v. Semasek*, 502 A.2d 109, 111 (1985).

Presently, Toy adopts the trial court's perspective, arguing that the Legislature did not articulate the reach of a bad faith claim under § 8371, and intended the statute to remedy any act that is prohibited to insurers under Pennsylvania's common or statutory law. Thus, Toy argues, if an insured alleges that an insurer violated a provision of the UIPA, as she has, the insured necessarily states a bad faith claim under § 8371.

We disagree. In 1990, at the time that the General Assembly enacted § 8371 to provide a remedy to an insured when his insurer " 'acted in bad faith toward [him],' 42 Pa.S.C. § 8371, the term 'bad faith' had acquired a 'peculiar and appropriate meaning' in this context." *See* 1 Pa.C.S. § 1903. When we incorporate that meaning into § 8371, as the Act instructs, and also consider that § 8371 speaks to an action "arising under an insurance policy," and grants an award based on the "amount of the claim from the date the claim was made by the insured," we need go no further than the words of the statute to ascertain that the Legislature did not intend to provide Toy with a remedy under § 8371 for the deceptive or unfair practices in which she alleges Metropolitan engaged in soliciting her purchase of the Policy. 42 Pa.C.S. § 8371. *See* 1 Pa.C.S. §§ 1903, 1921(a)-(b).

The historical development of the claim that an insured brings against its insurer when he accuses his insurer of acting in bad faith and the consideration that such a claim has been given reveals this to be the case.[12] During the early part of the Twentieth Century, insureds with liability policies who had been sued by third parties were routinely subjected to abusive settlement practices by insurers. Stephen S. Ashley ("Ashley"), Bad Faith Liability, § 1:03 at 8 (1st ed.1987). Because of these practices, insureds were often compelled to contribute their own monies to settle third party actions or were required to satisfy excess verdicts in actions that they had hoped to settle.[13] When the victims of such practices

12. There are two broad categories of insurance policies and corresponding claims for insurance coverage by insureds that have significance in this context. Richard L. McMonigle, Jr., Insurance Bad Faith in Pennsylvania ("McMonigle") § 2:02 at 14 (6th ed.2005). The first category is liability insurance under which an insured makes a third party claim. *Id.* Liability insurance protects the insured from actions brought by persons who are third parties to the insurance contract, and promises to cover the costs of defense, in the event that the insured is sued, and the costs of indemnity, in the event that the insured is found liable. *Id.* Claims by a policyholder of liability coverage that an insurance company acted in bad faith are often referred to as third party bad faith claims. *Id.* at 15.

The second category is non-liability insurance under which an insured makes a first party claim. *Id.* § 2:03 at 15. A non-liability insurance policy protects the insured from a risk of loss directly to him like, property damage, death, or illness, and promises to pay the insured a specified amount when the loss is sustained. *Id.* § 2:03 at 16. Claims by a policy holder in these circumstances are often referred to as first party bad faith claims. *Id.* at 16–17.

13. In a typical case, a third party sued the insured for an amount exceeding the limits of the insured's liability coverage, and offered to settle his claim for an amount equal to or less than the policy limits. Exercising its contractual right of exclusive control over defense and settlement, the insurer would refuse to accept the policy limits offer to settle, unless the insured contributed to the settlement. Ashley, § 1:02 at 5. Alternatively, a third party sued the insured and offered to settle, but in an amount that exceeded policy limits. The insured would request that the insurer consider contributing policy limits and would offer to pay the difference in order to settle the action. Again, exercising its contractual right of exclusive control over defense and settlement, the insurer would refuse. The action would go to trial, a verdict in excess of policy limits against the insured would result, and the insured would have to pay an amount to satisfy a judgment that was greater than the amount it had been willing to contribute to settle the

sought redress in the courts under the terms of their insurance contract, they found themselves without a remedy. This was because liability policies provided then, as they provide today, that an insured could not sue his insurer until a third party had obtained a judgment; that the insurer had full control of the defense and settlement of a claim; and that an insured may not settle except at his own expense. Ashley § 1:02 at 6; *C. Schmidt*, 90 A. at 654. Having rejected a breach of contract action in these circumstances, the early courts suggested that insureds in these circumstances should pursue a remedy by way of a tort cause of action, such as fraud or negligence. Ashley § 1.03 at p. 8.

The law in this regard changed. In the landmark case of *Hilker v. Western Automobile Ins. Co.*, 204 Wis. 1, 231 N.W. 257 (1930), an insured, who sought the amount he was compelled to pay to a third party who had secured a judgment in excess of the insured's liability coverage, brought a claim against his insurer, alleging that the insurer acted in bad faith, by not defending him properly, withholding information from him, and failing to settle the action within policy limits. Altering its traditional view that there was no remedy for insureds making such allegations, the Wisconsin Supreme Court recognized the insured's claim, and upheld the jury's verdict in his favor. *Id.* at 257–59. For the court, the theoretical underpinning of the insured's claim was the implied covenant of good faith and fair dealing that is part of every contract, and which provides that neither party to a contract will do anything to injure the right of the other to receive the benefits of their agreement. *Id.* at 258–59. Moreover, it was the court's view that recognition of such a claim for bad faith was needed in light of the provisions in insurance contracts that give insurers control over the defense and settlement of third party actions. *Id.* at 258.

In time, the courts in many jurisdictions provided a remedy at common law under the implied duty of good faith and fair dealing to an insured with liability insurance who alleged that

action. *See, e.g., C. Schmidt & Sons Brewing Co. v. Travelers' Ins. Co.*, 244 Pa. 286, 90 A. 653 (1914).

its insurer acted in bad faith in defending or settling or indemnifying a third party action. Ashley, § 1:05 and cases cited in footnote 1.[14]

Pennsylvania was one of those jurisdictions. In *Cowden v. Aetna Casualty and Surety Company*, 389 Pa. 459, 134 A.2d 223 (1957), this Court considered whether the evidence presented in the action between insured and insurer was sufficient to justify the jury's finding that in deciding to proceed with the trial to verdict, the insurer was guilty of bad faith in arriving at its decision. Even though we upheld the judgment n.o.v. entered for the insurer on the grounds that the evidence

14. *See, e.g., Shamblin v. Nationwide Mut. Ins. Co.*, 183 W.Va. 585, 396 S.E.2d 766 (1990); *State Farm Fire & Cas. Co. v. Nicholson*, 777 P.2d 1152 (Alaska 1989); *Hartford Acci. & Indem. Co. v. Foster*, 528 So.2d 255 (Miss.1988); *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138 (Colo. 1984); *Gibson v. W. Fire Ins. Co.*, 210 Mont. 267, 682 P.2d 725 (1984); *Kooyman v. Farm Bureau Mut. Ins. Co.*, 315 N.W.2d 30, 33 (Iowa 1982); *Kulak v. Nationwide Mut. Ins. Co.*, 40 N.Y.2d 140, 386 N.Y.S.2d 87, 351 N.E.2d 735 (1976); *Rector v. Husted*, 214 Kan. 230, 519 P.2d 634 (1974); *Members Mut. Ins. Co. v. Blissett*, 254 Ark. 211, 492 S.W.2d 429 (1973); *Howard v. State Farm Mut. Auto. Ins. Co.*, 60 Wis.2d 224, 208 N.W.2d 442 (1973); *Thompson v. Commercial Union Ins. Co.*, 250 So.2d 259 (Fla.1971); *State Auto. Ins. Co. v. Rowland*, 221 Tenn. 421, 427 S.W.2d 30 (1968); *Olson v. Union Fire Ins. Co.*, 174 Neb. 375, 118 N.W.2d 318 (1962); *Hartford Accident & Indem. Co. v. Cosby*, 277 Ala. 596, 173 So.2d 585 (1965); *Openshaw v. Allstate Ins. Co.*, 94 Idaho 192, 484 P.2d 1032 (1971); *State Farm Mut. Auto. Ins. Co. v. White*, 248 Md. 324, 236 A.2d 269 (1967); *Ammerman v. Farmers Ins. Exch.*, 19 Utah 2d 261, 430 P.2d 576 (1967); *Aetna Cas. & Sur. Co. v. Price*, 206 Va. 749, 146 S.E.2d 220 (1966); *W. Cas. & Sur. Co. v. Fowler*, 390 P.2d 602 (Wyo.1964); *Murach v. Massachusetts Bonding & Ins. Co.*, 339 Mass. 184, 158 N.E.2d 338 (1959); *Stilwell v. Parsons*, 145 A.2d 397 (Del. 1958); *American Fidelity & Cas. Co. v. L.C. Jones Trucking Co.*, 321 P.2d 685 (Okla.1957); *Farmers Ins. Exch. v. Henderson*, 82 Ariz. 335, 313 P.2d 404 (1957); *Krutsinger v. Ill. Cas. Co.*, 10 Ill.2d 518, 141 N.E.2d 16 (1957); *American Sur. Co. v. J.F. Schneider & Son, Inc.*, 307 S.W.2d 192 (Ky.1957); *Larson v. Anchor Cas. Co.*, 249 Minn. 339, 82 N.W.2d 376 (1957); *Radcliffe v. Franklin Nat. Ins. Co.*, 208 Or. 1, 298 P.2d 1002 (1956); *Hartford Accident & Indem. Co. v. Cosby*, 277 Ala. 596, 173 So.2d 585 (1965); *Zumwalt v. Utilities Ins. Co.*, 360 Mo. 362, 228 S.W.2d 750 (1950); *Hart v. Republic Mut. Ins. Co.*, 152 Ohio St. 185, 87 N.E.2d 347 (1949); *Dumas v. Hartford Accident & Indem. Co.*, 94 N.H. 484, 56 A.2d 57 (1947); *Johnson v. Hardware Mut. Cas. Co.*, 108 Vt. 269, 187 A. 788 (1936); *Hoyt v. Factory Mut. Liab. Ins. Co.*, 120 Conn. 156, 179 A. 842 (1935); *Tiger River Pine Co. v. Maryland Cas. Co.*, 163 S.C. 229, 161 S.E. 491 (1931); *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex.Com.App.1929).

was insufficient to impose liability upon the insurer, we acknowledged that "the contractual relationship under an indemnity policy was one requiring 'a high degree of good faith in the conduct of the indemnity company's counsel generally'"; that the insurer "must act with the utmost good faith" toward the insured in disposing of claims in third-party actions where there is little or no likelihood of a verdict or settlement within policy limits; and that the manner by which an insurer handles the defense of an third-party action can give rise to a claim by the insured that the insurer acted in bad faith. *Id.* at 229 (quotations omitted). We also noted that Pennsylvania was joining the jurisdictions throughout the country that had held that an insurer may be liable for the entire amount of a judgment secured by a third party against the insured, regardless of any limitation in the policy, if the insurer's handling of the claim, including a failure to accept a proffered settlement, was done in such a manner as to evidence bad faith on the part of the insurer in the discharge of its contractual duty. *Id.* at 227–28. *See also Gray v. Nationwide Mutual Insurance Co.,* 422 Pa. 500, 223 A.2d 8 (1966) (confirming *Cowden's* holding)

In 1973, this area of the law underwent another significant transformation by way of a decision rendered by the California Supreme Court. In *Gruenberg,* 9 Cal.3d 566, 108 Cal. Rptr. 480, 510 P.2d 1032 (1973), the court extended the remedy that had been given to an insured alleging bad faith in the third-party claim setting to an insured alleging bad faith in a first-party claim context. In *Gruenberg,* the court permitted an insured with a policy insuring his business premises against fire to rely on the implied duty of good faith and fair dealing to sue his insurer for refusing to pay for the property damage he sustained. The court held that where an insurer "fails to deal fairly and in good faith with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing." *Id.* at 1037.

Thereafter, a number of courts adopted *Gruenberg* or fashioned a similar approach so as to give a common law remedy to an insured who alleged that his insurer dealt with his first party claim in bad faith.[15] The Pennsylvania courts were not among them. In *D'Ambrosio*, 431 A.2d at 966, this Court was squarely presented with the opportunity to embrace *Gruenberg* and allow an insured who had made a first party claim for payment under his property insurance policy to recover compensatory damages, punitive damages and attorneys fees and costs on a theory that his insurer breached the implied duty of good faith and fair dealing by wrongfully refusing to pay for damage to his boats. We acknowledged that under *Gruenberg*, allegations that an insurer refused to compensate its insured for a loss covered by a policy without proper cause were actionable as a breach of the duty of good faith and fair dealing, and that the insured before us argued that such an action was the only remedy that would prevent insurance industry abuse in the of handling first party claims. *Id.* at 968. We determined, however, that "[a]lthough the seriousness of 'bad faith' conduct by insurance carriers cannot go unrecognized, our Legislature ha[d] already made dramatic, sweeping efforts to curb the bad faith conduct[ ]" in the UIPA, and indicated that it was "for the Legislature to announce and implement the Commonwealth's public policy governing the

15. *See, e.g., McCullough v. Golden Rule Ins. Co.*, 789 P.2d 855 (Wyo. 1990); *State Farm Fire & Cas. Co. v. Nicholson*, 777 P.2d 1152 (Alaska.1989); *Verrastro v. Middlesex Ins. Co.*, 207 Conn. 179, 540 A.2d 693 (1988); *Tank v. State Farm Fire and Cas. Co.*, 105 Wash.2d 381, 715 P.2d 1133 (1986); *In Re Certification of Question of Law*, 399 N.W.2d 320 (S.D.1987); *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165 (Tex.1987); *White v. Unigard Mut. Ins. Co.*, 730 P.2d 1014 (Idaho 1986); *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 452 N.E.2d 1315 (1983); *Travelers Ins. Co. v. Savio*, 706 P.2d 1258 (Colo. 1985); *Nichols v. State Farm Mut. Auto. Ins. Co.*, 279 S.C. 336, 306 S.E.2d 616 (1983); *Chavers v. National Sec. Fire & Cas. Co.*, 405 So.2d 1 (Ala.1981); *Noble v. National American Life Ins. Co.*, 128 Ariz. 188, 624 P.2d 866 (1981); *Bibeault v. Hanover Ins. Co.*, 417 A.2d 313 (R.I.1980); *Corwin Chrysler–Plymouth v. Westchester Fire*, 279 N.W.2d 638 (N.D.1979);; *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 271 N.W.2d 368 (1978); *MFA Mut. Ins. Co. v. Flint*, 574 S.W.2d 718 (Tenn.1978); *Christian v. Am. Home Assurance Co.*, 577 P.2d 899 (Okl.1977); *United States Fidelity & Guar. Co. v. Peterson*, 91 Nev. 617, 540 P.2d 1070 (1975).

regulation of insurance carriers." *Id.* at 969, 970. Therefore, we declined to supplement the system of sanctions established under the UIPA with a remedy to deter bad faith conduct on the part of insurers in the first party claim setting, and held that the "count in trespass for alleged bad faith conduct of an insurer, which seeks both punitive damages and damages for emotional distress, must be rejected." *Id.* at 970. At the same time, we invited the Legislature to consider whether additional sanctions were required to deter unscrupulous insurers in the Commonwealth. *Id.* at 970.

It was against this backdrop that the General Assembly enacted § 8371 in 1990. It is evident that by this time, the term "bad faith" as it concerned allegations made by an insured against his insurer, had acquired a particular meaning in the law. That is, the term "bad faith" concerned the duty of good faith and fair dealing in the parties' contract and the manner by which an insurer discharged its obligations of defense and indemnification in the third-party claim context or its obligation to pay for a loss in the first party claim context. *See, e.g., Cowden,* 134 A.2d at 223; *D'Ambrosio,* 431 A.2d at 966. *See also Black's Law Dictionary* 139 (6th ed.1990). (" 'Bad Faith' on the part of an insurer is any frivolous or unfounded refusal to pay proceeds of policy.") In other words, the term captured those actions an insurer took when called upon to perform its contractual obligations of defense and indemnification or payment of a loss that failed to satisfy the duty of good faith and fair dealing implied in the parties' insurance contract.[16] Thus, when § 8371, which provides a

**16.** The concurring opinion disagrees with our interpretation of § 8371, believing it to be too narrow and constrained by the particular fact patterns in *Cowden,* 134 A.2d at 223 and *D'Ambrosio,* 431 A.2d at 966.

It bears repeating that in this case, we determine the essence of the claim given to an insured under the bad faith statute. As we observe in footnotes 17 and 18, we do not consider what actions amount to bad faith, what actions of an insurer may be admitted as proof of its bad faith, whether an insurer's violations of the UIPA are relevant to proving a bad faith claim or whether the standard of conduct the Superior Court has applied to assess an insurer's performance of contractual obligations in bad faith cases is the correct one.

In this area, the term "bad faith" refers not only to the *claim* an insured brings against his insurer under the bad faith statute, but also,

remedy in an action "arising under an insurance policy" as to a claim an insured has made of his insurer, is read with this meaning of bad faith in mind, we can only conclude on the question before us, that the words of the statute are clear and explicit, and that the Legislature intended not to give relief under the bad faith statute to an insured who alleges that his insurer engaged in unfair or deceptive practices in soliciting the purchase a policy. 42 Pa.C.S. § 8371. Accordingly, we hold that Metropolitan Life was entitled to summary judgment

to the *conduct* an insured asserts his insurer exhibited and establishes that it is liable. These matters although related, are nonetheless, separate and distinct. We write to the former. The concurrence appears to write to the latter. In every one of the cases the concurrence cites on page 4 to describe our view of § 8371 as unduly restrictive and inconsistent with the Superior Court's perspective, the insured brought an action under § 8371, alleging that his insurer failed to satisfy his first party claim in the proper manner. The question before the court in each of those cases was not whether the insured alleged a cognizable claim under the bad faith statute. Rather, it was whether the evidence offered at trial by the insured as to the insurer's behavior was sufficient to prove the bad faith claim and/or admissible in a § 8371 action. *See,* e.g., *Condio v. Erie Ins. Exch.,* 899 A.2d 1136, 1153 (Pa.Super.2006) (2006) (concluding, *inter alia,* that the record did not support the findings that the insurer failed to pursue a thorough independent investigation, treated the insured as an adversary; or failed to keep the insured informed); *Zimmerman v. Harleysville Mutual Ins. Co.,* 860 A.2d 167, 173 (Pa.Super.2004) (concluding that the evidence supported the findings that the insurer improperly asserted that its insured concealed information or had prior knowledge of a structural problem with the roof and denied coverage on an unsupportable theory); *O'Donnell v. Allstate Ins. Co.,* 734 A.2d 901 (Pa.Super.1999) (concluding that conduct by an insurer, whether occurring before, during, or after litigation of the bad faith claim is admissible to show bad faith, but that the insured failed to present evidence of improper investigative tactics or an unreasonable denial of the claim).

In the same way, the concurring opinion's quotation of this author's dissenting statement in *Hollock v. Erie Ins. Exch.,* 588 Pa. 231, 903 A.2d 1185, 1189 (2006), misses the mark. There, the insured brought a claim under § 8371 alleging that her insurer failed to properly process and pay her claim for underinsured motorist coverage. The issue presented to this Court was whether the conduct of the insurer during discovery and throughout the course of the trial on the insured's bad faith claim should have been considered for purposes of establishing liability and setting the amount of the punitive damages award. The issue was not, as here, whether the claim the insured brought against the insurer fell within § 8371's purview, given the meaning of the statutory term "bad faith." 42 Pa.C.S. § 8371.

on Toy's § 8371 claim as a matter of law.[17,18]

### B. *The Consumer Protection Law*

We next turn to Toy's second issue, which is whether the Superior Court erred in holding that justifiable reliance is an element of her Consumer Protection Law claims. This issue concerns the meaning of 73 P.S. § 201–9.2, the provision in the Consumer Protection Law that creates a private right of action. Section 201–9.2 states in relevant part that "any

**17.** We would end our discussion of Toy's first issue here, but for our desire to clarify an assertion of Toy's that has no merit. Toy contends that the Superior Court has repeatedly held that allegations of UIPA violations constitute a claim of bad faith under § 8371. The cases that Toy cites in her brief for support do not stand for this proposition, but rather, concern two questions raised by the bad faith statute with which the lower courts have been grappling, but which are not before us and remain for another day.

The first question concerns the role that the UIPA may play in the trial of a bad faith claim. Even though it is the Insurance Commissioner who enforces the statute, there are Superior Court decisions that conclude that an insured may ask the court to consider whether an insurer's violations of the UIPA are evidence that an insurer acted in bad faith under § 8371 in handling a claim. *See, e.g., Romano v. Nationwide Mutual Fire Ins. Co.,* 435 Pa.Super. 545, 646 A.2d 1228 (1994) (holding that the insured may make reference to a section in the UIPA to illustrate its insurer's bad faith behavior for refusing to pay a loss). *But see Parasco v. Pacific Indemnity Co.,* 920 F.Supp. 647 (E.D.Pa.1996) (explaining that the insured's references to sections of the UIPA that cover unfair claim or settlement practices if committed with such frequency as to indicate a business practice do not show that the insurer should be liable under § 8371 for wrongfully failing to defend or settle in a particular case).

The second issue concerns whether an insurer's conduct in litigating the bad faith claim that its insured asserts against it in a complaint may be considered by the court in determining whether and to what extent an insured is entitled to relief under § 8371. *See, e.g., Hollock v. Erie Ins. Exchange,* 842 A.2d 409 (Pa.Super.2004), *dismissed as improvidently granted,* 588 Pa. 231, 903 A.2d at 1185.

**18.** We also observe that given our disposition, we take no position on the Superior Court's reasoning in granting Metropolitan Life summary judgment, which was a reiteration of the standard of conduct that the Superior Court has applied in other cases to determine whether the insurer is liable under § 8371. *See supra* p. 9. Likewise, given the context in which the question concerning the scope of the bad faith statute arose in this case, we take no position on whether § 8371 creates an independent cause of action or is a form of additional relief under a cause of action. *See Birth Center v. St. Paul Companies,* 567 Pa. 386, 787 A.2d 376, 387 n. 14 (2001).

person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act." 73 P.S. § 201–9.2.

Toy contends that as a matter of statutory construction, the phrase "as a result of" in § 201–9.2 requires her to establish nothing more than a causal connection between her loss and Defendants' unlawful behavior, not justifiable reliance, as the Superior Court concluded. Toy's position is premised on the contention that the Superior Court incorrectly relied on this Court's decision in *Weinberg* for its conclusion. While Toy does not dispute that under Pennsylvania law, justifiable reliance is an element of common law fraud, *see Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889 (1994), she argues that *Weinberg* does not state that the Consumer Protection Law requires that a private party prove it. Rather, all *Weinberg* states is that a private party must prove "reliance." Since under the law, "reliance" can mean "reasonable reliance" or "justifiable reliance" or bare "reliance in fact," *see Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), Toy argues that the level of reliance she must prove under the Consumer Protection Law has yet to be settled, and urges this Court to hold that only the lowest level of reliance is required of her in order to impose liability under the Consumer Protection Law on the Defendants.

■ Toy is mistaken. Our decision in *Weinberg* did indeed settle that justifiable reliance is an element of the claims Toy brought under the Consumer Protection Law. In *Weinberg*, the plaintiffs brought a class action against Sun Oil Company ("Sun") under the Consumer Protection Law alleging that certain television and radio advertisements Sun had broadcasted about the gasoline it was selling were misleading and in violation of 73 P.S. § 201–2(4)(v), (vii), (ix), and (xvii).[19] While

19. Except for a claim under 73 P.S. § 201–2(4)(ii), the Consumer Protection Law claims that Toy asserts were also asserted by the plaintiffs in *Weinberg*. In our view, this does not amount to a material

the plaintiffs proposed a class that was limited to consumers who had purchased Sun gasoline, it was not limited to those consumers who had relied on the ads in making their purchasing decisions. At the class certification hearing, the plaintiffs took the position that under the Consumer Protection Law, reliance on Sun's allegedly deceptive ads need not be shown by each member of the class before the class could be certified. Sun countered that under the statute, individual detrimental reliance on the ads and causation must be shown, and that this requirement would render class certification inappropriate. The trial court agreed with Sun and denied class certification. *Weinberg*, 777 A.2d at 444.

The Superior Court, however, disagreed. Following its reasoning in its prior decision, *DiLucido v. Terminix International, Inc.*, 450 Pa.Super. 393, 676 A.2d 1237 (1996), the Superior Court determined that while the claims plaintiffs brought under § 201–2(4)(vii) and the catchall at § 201–2(4)(xvii) were fraud-based and required proof of the traditional elements of common law fraud, the claims they brought under § 201–2(4)(v) and § 201–2(4)(ix) for false advertising, were different and did not require a showing of reliance. 777 A.2d at 444–45. Accordingly, the Superior Court affirmed the trial court in part and reversed the trial court in part. *Id.*

This Court granted allocatur to Sun, and in a unanimous decision, rejected the Superior Court's conclusion that the Consumer Protection Law did not require plaintiffs to prove the traditional elements of common law fraud in all of their claims. *Id.* at 446–47. We determined that the Superior Court's view of the Consumer Protection Law, which the court had previously articulated in *DiLucido*, was erroneous because it was premised on the considerations that guide the Attorney General when he is pursuing an enforcement action. *Id.* at 445–46. Construing the language in 73 P.S. § 201–9.2, which provides for a private right of action, and differentiating it from the language in 73 P.S. § 201–4, which authorizes

difference in the nature of the allegations Toy made under the Consumer Protection Law against defendants and those made by the plaintiffs against Sun in *Weinberg*.

Commonwealth officials to act in the public interest, we reiterated that " 'the [Consumer Protection Law's] underlying foundation is fraud prevention[,]' " and held that "[n]othing in the legislative history [of the Consumer Protection Law] suggests that the legislature ever intended statutory language directed against consumer fraud to do away with the traditional common law elements of reliance and causation." 777 A.2d at 466 and n. 1 (quoting *Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 329 A.2d 812, 816 (1974), and citing *Legislative Journal: House of Representatives,* 1975 Sess. vol. 1, no. 63, at 2149–60, 2180–82 (July 16, 1975) (remarks upon final House passage); *Legislative Journal: Senate,* 1976 Sess. vol. 1, no. 114, at 1197–98 (June 28, 1976) (remarks upon final Senate passage)). Accordingly, we concluded that all of the plaintiffs' claims incorporated the traditional elements of common law fraud of reliance and causation. *Id.* at 446.

■■ As the type of reliance that a plaintiff alleging common law fraud must prove is justifiable reliance, *see Gibbs,* 647 A.2d at 889, *Weinberg* necessarily states that a plaintiff alleging violations of the Consumer Protection Law must prove justifiable reliance. *See Yocca v. Pittsburgh Steelers Sports, Inc.,* 578 Pa. 479, 854 A.2d 425 (2004) (confirming that *Weinberg* held that justifiable reliance was required of Consumer Protection Law plaintiffs). Therefore, under *Weinberg* we hold that justifiable reliance is an element of Toy's Consumer Protection Law claims.[20]

**20.** In addition to her mistaken interpretation of this Court's decision in *Weinberg,* Toy makes erroneous assertions about the Consumer Protection Law as it relates to her claims that we take this opportunity to correct. First, Toy baldly asserts that the Consumer Protection Law is a uniform act within the meaning of 1 Pa.C.S. § 1927 that must be construed, as other state consumer protection laws have been construed, to require a showing of only ordinary reliance. In point of fact, the Consumer Protection Law is not a uniform act, and the consumer protection laws that the States have enacted differ from one another in many respects. *See Stetser v. TAP Pharmaceutical Products, Inc.,* 165 N.C.App. 1, 598 S.E.2d 570, 584–85 (2004) (comparing and contrasting the differences among state consumer protection laws).

Second, Toy contends that any construction of the Consumer Protection Law that requires justifiable reliance cannot stand in view of the standards that the Federal Trade Commission applies in pursing en-

## C. Justifiable Reliance

We now turn to Defendants' appeal. Defendants contend that the Superior Court erred in reversing the trial court's order granting them summary judgment on Toy's Consumer Protection Law claims. Defendants rely on this Court's decision in *Yocca*. They argue that under the analysis we set forth in that case, Toy is precluded as a matter of law from pointing to Martini's alleged misrepresentations about the Policy to establish the essential element of justifiable reliance because those misrepresentations are rebutted by the terms of a clearly written and fully integrated contract. Defendants also argue that it follows from *Yocca's* holding that a plaintiff in Toy's position should be required to read the parties' written contract, such that an action under the Consumer Protection Law does not lie for a party who neglects to do so and thereby fails to detect the differences between the writing and the misrepresentations that were allegedly made about its contents.

We start with our decision in *Yocca*. *Yocca* concerned claims that were brought by purchasers of stadium builder licenses ("SBLs"). SBLs were licenses that granted the purchaser the right to buy annual season tickets to games that would be played in the new stadium being built for the Pittsburgh Steelers football team. The plaintiffs received a brochure ("SBL Brochure") that included diagrams depicting the general location of seats in the new stadium, information about applying for the purchase of SBLs, and the process by which one could indicate his preference for specific seats. Each plaintiff applied for an SBL and ultimately executed a

forcement actions under the Federal Trade Commission Act. Setting aside the question of what standards actually govern the Federal Trade Commission's enforcement actions, we recognize that federal decisions brought under the federal statute can provide guidance. *See Monumental Properties*, 329 A.2d at 818. There is, however, no rule that binds us to those decisions.

Finally, Toy's several arguments relating to the amendment that was made to the catchall provision of the Consumer Protection Law in 1996 are irrelevant. As noted, Toy's claims arose and are brought under the statute as it existed before it was amended in 1996. *See supra* n. 1. Therefore, the 1996 amendment has no bearing in this appeal.

written agreement ("SBL Agreement"), specifying the number of SBLs he purchased, the fee, and the location of his stadium seats. The SBL Agreement incorporated a document of additional terms by reference, which included an integration clause, stating that the SBL Agreement "contains the entire agreement of the parties with respect to matters provided for herein and shall supersede any representations or agreements previously made or entered into by the parties hereto." 854 A.2d at 431.

Subsequently, the plaintiffs were disappointed to learn that the seats they were assigned in the stadium were not located where they expected them to be, given the diagrams that accompanied the SBL Brochure. The plaintiffs filed a complaint against several defendants (collectively, the "Steelers"), alleging, *inter alia,* that the Steelers breached the parties' contract by not fulfilling promises made in the SBL Brochure about the process of assigning stadium seats, and violated the Consumer Protection Law by making false assurances in the SBL Brochure that requests for seats in specific stadium sections would be met and that price reductions would be made, if such requests could not be honored.

The Steelers filed preliminary objections in the nature of a demurrer to the claims, which the trial court sustained. Pointing out that the SBL Agreement was fully integrated, thereby superseding any of the parties' previous negotiations reflected in the SBL Brochure, the trial court concluded the parol evidence rule precluded the plaintiffs from pursuing their breach of contract claims. *Id.* at 433. Determining that the SBLs were neither goods nor services that the Consumer Protection Law covered, and that even if they were, the plaintiffs could not prove that they relied on prior representations in the SBL Brochure because of the fully integrated contract they had signed, the trial court also concluded that the plaintiffs' Consumer Protection Law claims failed. *Id.*

On appeal, the Commonwealth Court reversed the trial court's order, holding that dismissal of the plaintiffs' claims at the preliminary objections stage was improper insofar as it was not completely clear that the SBL Agreement represent-

ed the parties' entire contract or that the sale of SBLs fell outside the Consumer Protection Law's purview. *Id.* at 434–35.

This Court reversed the Commonwealth Court. We first explained the parol evidence rule as applied in Pennsylvania. We reiterated that the rule declares that where " 'the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only evidence of their agreement[;]' " that "[a]ll preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract[;]' " and that " 'unless fraud, accident, or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence.' " *Id.* at 436 (quoting *Gianni v. Russell Co.,* 281 Pa. 320, 126 A. 791, 792 (1924)). We further explained that for the parol evidence rule to apply, there must be a writing that represents the parties' entire contract, and that whether there exists such a writing is determined by assessing whether the writing appears to be a contract complete in itself, importing a complete legal obligation without any uncertainty as to the object or extent of the parties' engagement. *Id.* We also noted that an integration clause that states that the writing is meant to represent the parties' entire agreement is a clear sign that the writing is meant to be just that, and thereby expresses all of the parties' negotiations, conversations and agreements made prior to its execution. *Id.*

We then discussed the so-called exceptions to the rule, observing that parol evidence may be introduced to vary a writing meant to be the parties' entire contract, when a party avers that that the contract is ambiguous or that a term was omitted from the contract because of fraud, accident or mistake. *Id.* at 437. With regard to the exception for fraud, we noted that this Court has restricted the exception to allegations of fraud in the execution of a contract, and has refused to apply the exception to allegations of fraud in the inducement of a contract. We stated that "while parol evidence may be

introduced based on a party's claim that there was fraud in the execution of a contract, *i.e.*, that a term was fraudulently omitted from the contract, parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, *i.e.*, that an opposing party made false representations that induced the complaining party to agree to the contract." *Id.* n. 26 (citing *HCB Contractors v. Liberty Place Hotel Associates,* 539 Pa. 395, 652 A.2d 1278, 1279 (1995), and *Bardwell,* 100 A.2d at 104).[21]

Applying these principles to the case at hand, we determined that the SBL Agreement represented the parties' entire contract and was unambiguous concerning the sale of SBLs. Because the plaintiffs' claim was for fraud in the inducement, based on allegations that the representations the Steelers made in the SBL Brochure about the sale of SBLs led the plaintiffs to agree to enter into the SBL Agreement, we determined that the parol evidence rule applied, rather than the rule's fraud exception. *Id.* at 438. Applying the rule, we concluded that any evidence of previous negotiations or agreements between the parties concerning the sale of SBLs to vary or explain those terms as expressed in the SBL Agreement was barred from admission. *Id.* Further, we agreed with the trial court that the plaintiffs' breach of contract claims, based on allegations that the Steelers violated terms and conditions in the SBL Brochure, were properly

**21.** In *Bardwell,* we announced our decision to deny the fraud exception to a party who only alleges that he was induced by fraud into entering into an agreement, but to allow it to a party who also alleges that a misrepresentation was fraudulently omitted from the parties' written contract as follows:

> There is not the slightest doubt that if plaintiffs had merely averred the falsity of the alleged oral representations, parol evidence thereof would have been inadmissible. Does the fact that plaintiffs furthere [sic] averred that these oral representations were *fraudulently made* without averring that they were *fraudulently* or by accident or mistake *omitted* from the subsequent complete written contract suffice to make the testimony admissible? The answer to this question is "no"; if it were otherwise the parol evidence rule would become a mockery, because all a party to the written contract would have to do to avoid, modify or nullify it would be to aver (and prove) that the false representations were *fraudulently* made.

*Id.* (emphasis in original).

dismissed because those terms and conditions could form no part of the parties' contract. *Id.*

We then determined that the plaintiffs' Consumer Protection Law claims, which required that the plaintiffs prove that they justifiably relied on the SBL Brochure's representations, failed as matter of law. *Id.* at 439. We observed that the plaintiffs' Consumer Protection Law claims and their allegations of justifiable reliance were premised on the assertion that representations in the SBL Brochure about the sale of SBLs induced them into purchasing them and becoming parties to the SBL Agreement. *Id.* We also observed that under the parol evidence rule, any of those representations were superceded by the fully integrated agreement the parties signed and that reliance upon them was disclaimed therein. *Id.* Accordingly, we concluded that "*given this Common-wealth's adoption of the parol evidence rule,* [the plaintiffs] simply [could] not be said to have *justifiably* relied on any representations made by the Steelers before the parties entered into the SBL Agreement." *Id.* (emphasis added and in original). Thus, we held that the allegations in the plaintiffs' complaint failed to establish that they were entitled to relief under the Consumer Protection Law. *Id.*

Turning to the case at hand, our careful consideration of the principles that guided us in *Yocca* reveals that the conclusion we reached there, that the plaintiffs' allegations of justifiable reliance were unsustainable as a matter of law is inapt. Defendants are correct that Toy's Consumer Protection Law claims, like those made in *Yocca*, concern a fully integrated contract,[22] and that Toy's allegations of justifiable reliance, like those made in *Yocca*, concern misrepresentations that do not appear as terms or conditions in the parties' written agreement. Defendants have overlooked, however, that the Superior Court found that Toy's fraud claims concerning the savings plan features that Defendants represented would be included

22. That the Policy is a fully integrated contract was implicitly determined by the trial court when it held that the parol evidence rule applied in Toy's case. This particular determination was impliedly upheld by the Superior Court.

in the parties' agreement amount to a claim for fraud in the execution of a contract,[23] and that as such, demand a far different analysis than that applied to the fraud claim alleged by the plaintiffs in *Yocca* concerning the representations in the SBL Brochure that induced them into entering into the SBL Agreement. As we explained in *Yocca*, while the fraud exception to the parol evidence rule potentially applies in two scenarios—fraud in the inducement, where a party alleges that he was induced into entering the agreement through the other's fraud, and fraud in the execution, where a party alleges that he was mistaken as to the terms and the actual contents of the agreement he executed due to the other's fraud—this Court has determined that in Pennsylvania, only fraud in the execution, which is alleged in this case, but was not alleged in *Yocca*, is excepted from the parol evidence rule's operation. *See Bardwell*, 100 A.2d at 104.[24]

The fact that the parol evidence rule is not applied to a fraud in the execution of a contract claim, like Toy's, is

**23.** As noted, the Superior Court disagreed with the trial court's decision that the parol evidence rule barred Toy's Consumer Protection Law claims, holding that Toy's claim fell within the fraud in the execution of a contract exception. *See supra* p. 10. Defendants did not challenge the Superior Court's characterization of Toy's claims in this regard. Nor did Defendants request that we revisit our recognition of an exception to the parol evidence rule for a fraud in the execution of a contract claim.

**24.** There are several reasons for this distinction. First, the policy that the parol evidence rule aims to serve, which is to uphold the integrity of the written contract because that writing is considered the embodiment the parties' true agreement, *see Rose v. Food Fair Stores, Inc.*, 437 Pa. 117, 262 A.2d 851, 853 (1970), is not furthered by a refusal to recognize the fraud in the execution exception, as it is in refusing to recognize an exception for fraud in the inducement. This is so because in the fraud in the execution context, the allegation is that the written agreement *is not* the expression of the parties' true and complete contractual intent inasmuch as terms that were agreed to by the parties were omitted from that writing through fraud. Second, if a party were allowed to introduce representations made prior to contract formation that contradicted or varied the terms of his written contract by merely alleging that the representations were fraudulent, the fraud exception could swallow the rule. *See Bardwell*, 100 A.2d at 104. And third, a party to a contract has the ability to protect himself from fraudulent inducements by insisting that those "inducements" be made part of the written agreement, and refusing to contract if they are not. *Id.*

significant. It means that when fraud in the execution is alleged, representations made prior to contract formation are not considered superseded and disclaimed by a fully integrated written agreement, as they are when fraud in the inducement is asserted. Thus, our analysis of the element of justifiable reliance in *Yocca*—that due to the parol evidence rule's operation, a party cannot be said to have justifiably relied on prior representations that he has superseded and disclaimed through a fully integrated written contract—does not apply in a fraud in the execution of a contract context, where the prior representations are not deemed superseded or disclaimed under the parol evidence rule, but instead, are viewed as wrongfully absent from the writing that was to memorialize the parties' contractual undertaking. *See Yocca*, 854 A.2d at 439. Therefore, we conclude that in Toy's case, *Yocca's* analysis on the element of justifiable reliance is presently unavailing.

■ This brings us to Defendants' argument that Toy's failure to read the Policy should also lead to *Yocca's* result. In this context, in order to adopt Defendants' argument, we would have to conclude that even a party whose fraud in the execution of a contract claim is not subject to the parol evidence rule's operation is unable as a matter of law to prove justifiable reliance on misrepresentations that he alleges were fraudulently omitted from the written contract because he did not read the contract to see that they were not in it.

We cannot reach this conclusion. Defendants' position is tantamount to imposing upon such a party a duty to investigate the falsity of the misrepresentations upon which he brings suit, and as such, overrides the law that we have developed over the years for the determination of the element of justifiable reliance in this area. Some time ago, we determined that a party who engages in intentional fraud should be made to answer to the party he defrauded, even if the latter was less than diligent in protecting himself in the conduct of his affairs. *See Emery v. Third National Bank of Pittsburgh*, 171 A. 881, 882 (1934) (quotation omitted) (" 'The law is not designed to protect the vigilant alone, although it rather

favors them, but is intended as a protection to even the foolishly credulous, as against the machinations of the designedly wicked.'"). In this regard, we consulted the Restatement of Torts, determined that its approach to the element of justifiable reliance coincided with our own, and as we had done before, embraced the rules it set forth. That is, we have relied on the principle that the recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely, but that he is not justified in relying upon the truth of an allegedly fraudulent misrepresentation if he knows it to be false or if its falsity is obvious. *Merritz v. Circelli*, 361 Pa. 239, 64 A.2d 796, 798 (1949) (citing Restatement (First) of Torts § 540 for the parameters of the element of justifiable reliance for fraud); *See Neuman v. Corn Exchange Nat. Bank & Trust Co.*, 356 Pa. 442, 51 A.2d 759, 763 (1947) and *Savitz v. Weinstein*, 395 Pa. 173, 149 A.2d 110, 113 (1959) (*citing* Restatement (First) of Torts § 525 for the elements of fraud); *Gibbs*, 647 A.2d at 888, (*citing* Restatement (Second) of Torts § 525 for the elements of fraud).[25] *Cf. Porreco v. Porreco*, 571 Pa. 61, 811 A.2d 566 (2002) (plurality) (dissenting, Saylor, J.) (explaining that where a party's reliance is to be justifiable, a party is not under a duty to investigate according to the Restatements of Law of Torts and Contracts). Accordingly, we conclude that Toy was under no duty to read the Policy and the fact that she did not do so does not preclude her from establishing justifiable reliance.

 Finally, like the Superior Court, we disagree with the trial court's determination that Toy could not establish justifiable reliance because the falsity of Martini's misrepresenta-

---

**25.** For this reason, we note that the Superior Court correctly relied on the principles in Sections 540 and 541 of the Restatement (Second) of Torts, *see supra* pp. 10–11, to analyze the issue of Toy's justifiable reliance in the present case. In our view, however, there was no need for the Superior Court to look for guidance in insurance cases in which an insured asserted that he was entitled to certain coverage, even though the insurance contract itself did not provide such coverage and despite the fact that the insured did not read the policy to discover the extent of the coverage actually provided. *See, e.g., Pressley v. Travelers Property Casualty Corp.*, 817 A.2d 1131 (Pa.Super.2003).

tions about the Policy was obvious, given the information on the Policy's cover sheet. We have stated that justifiable reliance is typically a question of fact for the fact-finder to decide, and requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction. *See Scaife Co. v. Rockwell–Standard Corp.*, 446 Pa. 280, 285 A.2d 451, 455 (1971). In that Toy asserts that Martini told her that the Metropolitan Life product she was purchasing included a life insurance component, we conclude that it is for the jury to decide whether the falsity of Martini's alleged misrepresentations about the Policy's contents was obvious to Toy and whether her reliance was unjustified. Accordingly, we hold that Defendants are not entitled to summary judgment on Toy's Consumer Protection Law claims because there is a genuine issue of material fact as to the essential element of justifiable reliance. *See* Pa.R.C.P. No. 1035.2(1).

### III.

In summary, this Court concludes that: (1) 42 Pa.C.S. § 8371 does not encompass allegations by an insured that his insurer engaged in unfair or deceptive practices in soliciting the purchase of a policy; (2) this Court's decision in *Weinberg*, 565 Pa. 612, 777 A.2d 442, stands for the proposition that that a plaintiff alleging violations of the Consumer Protection Law must prove the common law fraud element of justifiable reliance; (3) a plaintiff whose Consumer Protection Law claims set forth a fraud in the execution of a contract claim is not precluded as a matter of law from establishing the element of justifiable reliance; and that (4) such a plaintiff is not under a duty to read the contract in order to allege and prove the element of justifiable reliance.

### IV.

For all of the forgoing reasons, the order of the Superior Court is affirmed, albeit as a matter of statutory construction as to the claim brought by Toy under § 8371.

Justice BALDWIN did not participate in the consideration or decision of this case.

Former Justice NEWMAN did not participate in the decision of this case.

Chief Justice CAPPY delivered the Opinion of the Court with respect to Part I and Part II(B), in which Justice Castille, Saylor, Eakin and Baer join; with respect to Part II(A), in which Justice Castille and Saylor join; and with respect to Part II(C), in which Justice Eakin and Baer join.

Justice EAKIN files a concurring opinion in which Justice Baer joins.

Justice SAYLOR files a concurring and dissenting opinion in which Justice Castille joins.

Justice EAKIN, concurring.

I join Part I, Part II(B), and Part II(C). While I agree with the result of Part II(A), I write separately because I find 42 Pa.C.S. § 8371 is not limited to actions for an insurer's wrongful failure to pay an insurance claim or disposal of its obligations of defense and indemnification. The majority finds support for a narrow interpretation of "bad faith" in our case law prior to the enactment of § 8371, arguing:

> [T]he term "bad faith" as it concerned allegations made by an insured against his insurer, had acquired a particular meaning in the law ... concern[ing] the duty of good faith and fair dealing in the parties' contract and the manner by which an insurer discharged its obligations of defense and indemnification in the third-party claim context or its obligation to pay for a loss in the first party claim context.

Majority Op., at 41, 928 A.2d at 199. However, the plain language of § 8371 is not so limited as it provides a court may grant relief whenever an insurer has acted in bad faith toward an insured, so long as the "action aris[es] under an insurance policy. . . ." See 42 Pa.C.S. § 8371 ("In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of

the following actions...."). Had the General Assembly intended to limit § 8371 to case law limiting claims to an insurer's bad faith refusal to pay or dispose of claims, it could have used more restrictive language to limit § 8371 to "actions arising under an insurance *claim*" as opposed to those "under an insurance *policy*." *See Commonwealth v. Rieck Investment Corporation*, 419 Pa. 52, 213 A.2d 277, 282 (1965) (The "legislature must be intended to mean what it has plainly expressed." (citation omitted)).

The majority argues because § 8371 permits a court to award interest on the "amount of the claim from the date the claim was made by the insured," the section does not provide a private remedy for the deceptive or unfair practices of insurance companies. *See* Majority Op., at 35, 928 A.2d at 196 (quoting § 8371(1)). However, § 8371 also provides an award of punitive damages or the assessment of court costs and attorney's fees against the insurer. *See* 42 Pa.C.S. § 8371(2–3). While the award of interest under the wording of § 8371(1) may apply exclusively to an insurer's bad faith failure to pay a claim, the plain language of § 8371(2) and § 8371(3) is not limited in this manner and thus may provide a remedy for any other "bad faith" conduct. Therefore, I cannot join the inference that the remedial provisions of § 8371 in any way restrict the meaning of "bad faith."

The majority's reliance on *Cowden v. Aetna Casualty and Surety Co.*, 389 Pa. 459, 134 A.2d 223 (1957), and *D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.*, 494 Pa. 501, 431 A.2d 966 (1981), to establish a "peculiar and appropriate meaning" of the term "bad faith" in the insurance context is equally unpersuasive, as neither expressly limited the notion of "bad faith." In fact, *D'Ambrosio* employed the term "bad faith" according to the trade practices determined to be unfair methods of competition or unfair or deceptive acts or practices under the Unfair Insurance Practices Act (UIPA): [1]

Although the seriousness of "bad faith" conduct by insurance carriers cannot go unrecognized, our Legislature has

1. *See* 40 P.S. §§ 1171.1–1171.15.

already made dramatic, sweeping efforts to curb the bad faith conduct.

\* \* \*

There is no evidence to suggest, and we have no reason to believe, that the system of sanctions established under the [UIPA] must be supplemented by a judicially created cause of action.... Surely it is for the Legislature to announce and implement the Commonwealth's public policy governing the regulation of insurance carriers. In our view, it is equally for the legislature to determine whether sanctions beyond those created under the Act are required to deter conduct which is less than scrupulous.

Our conclusion that the [UIPA] serves adequately to deter bad faith conduct applies not only to appellant's attempt to recover punitive damages but also to his attempt to recover damages for "emotional distress."

*D'Ambrosio*, at 969, 970. Thus, even if our jurisprudence prior to *D'Ambrosio* established a "particular and appropriate meaning" of the term "bad faith" in the insurance context, *D'Ambrosio* significantly expanded the meaning of the term.[2]

Subsequently, we held the duty of good faith in the insurance context "includes the duty of full and complete disclosure as to all of the benefits and every coverage that is provided by

---

2. The Superior Court and the U.S. District Court for the Eastern District of Pennsylvania have interpreted *D'Ambrosio* to allow consideration of alleged UIPA violations in determining "bad faith" conduct under § 8371. *See The Brickman Group, Ltd. v. CGU Ins. Co.*, 865 A.2d 918, 930 (Pa.Super.2004) ("[C]onduct which constitutes a violation of the UIPA may also be considered when determining whether an insurer acted in bad faith under [§ 8371]."); *O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa.Super.1999) (same); *Romano v. Nationwide Mut. Fire Ins. Co.*, 435 Pa.Super. 545, 646 A.2d 1228, 1233 (1994) ("While the UIPA does not specifically refer to an insurer's 'bad faith,' [*D'Ambrosio*] utilized that term to describe conduct within the UIPA's reach."); *see also MacFarland v. U.S. Fidelity & Guar. Co.*, 818 F.Supp. 108, 110 (E.D.Pa.1993) (considering alleged conduct constituting violations of UIPA in determining bad faith); *Rottmund v. Continental Assurance Co.*, 813 F.Supp. 1104, 1109 (E.D.Pa.1992) (examining other statutes on similar subjects to describe bad faith under § 8371); *Coyne v. Allstate Ins. Co.*, 771 F.Supp. 673, 678 (E.D.Pa.1991) (utilizing provisions of UIPA to describe bad faith conduct).

the applicable policy or policies along with all requirements, including any time limitations for making a claim." *Dercoli v. Pa. Nat'l Mut. Ins. Co.*, 520 Pa. 471, 554 A.2d 906, 909 (1989). Moreover, the Superior Court has not followed the majority's restrictive view. *See Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1142 (Pa.Super.2006) (considering whether insurer acted in bad faith in selecting neutral arbitrator, securing witness testimony, and permitting attorney to delay litigation); *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 500–01 (Pa.Super.2004) ("Bad faith encompasses a wide variety of objectionable conduct. . . . [It] also includes 'lack of good faith investigation into facts, and failure to communicate with the claimant.' " (citation omitted)); *Zimmerman v. Harleysville Mutual Ins. Co.*, 860 A.2d 167, 173 (Pa.Super.2004) ("The scope of [§ ] 8731 has been extended to the investigatory practices of an insurer during litigation initiated by an insured to obtain the proceeds of his or her insurance policy."); *O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 909–10 (Pa.Super.1999) (same).

Therefore, I disagree with the majority that in promulgating § 8371 the General Assembly intended "bad faith" to have a "peculiar and appropriate meaning" constrained by the particular fact situations in *Cowden* and *D'Ambrosio*. Instead, "bad faith" concerns any breach of an insurer's "implied covenant of good faith and fair dealing" in the parties' contract. An insurer must refrain from any act that would injure the insured's right to receive the benefit of the contract.

Nevertheless, I must conclude appellant does not have a remedy under § 8371 for the alleged bad faith conduct committed by appellees in soliciting the purchase of appellant's policy. Extending the insurer's duty of good faith to conduct occurring prior to the making of the insurance policy is contrary to the plain language of § 8371. In my opinion, an insurer's duty of good faith begins only after the creation of an insurance policy. Before the insured receives and signs the policy, there is no legal relationship between the insurer and insured, and neither party has undertaken any obligation regarding the future agreement. Thus, misrepresentations or false statements made by an insurer regarding an insurance

policy, while falling under the broad meaning of "bad faith" conduct, do not breach any duty of good faith towards the insured before the creation of the policy. *See Brickman Group Ltd.*, at 930. They do not arise "under an insurance policy."

Because a bad faith claim is a statutory creation, the extent of an insurer's duty to an insured must be resolved by the rules of statutory interpretation. *See* 1 Pa.C.S. § 1921. Section 8371 provides, *"In an action arising under an insurance policy,* if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions...." 42 Pa.C.S. § 8371 (emphasis added). In addressing whether the scope of the duty of good faith under § 8371 extended to conduct of the insurer during the litigation of a bad faith claim, Chief Justice Cappy noted:

> The obvious problem in looking at the words is the lack of clarity on the question of where the line should be drawn on the scope of the "action arising under an insurance policy" when assessing whether the insurer acted in bad faith. Is the scope of the conduct limited to the conduct of the insurer on the underlying policy[,] ... or does it extend to the entire litigation that resulted from the initial claim under the insurance policy....

*Hollock v. Erie Ins. Exch.*, 588 Pa. 231, 903 A.2d 1185, 1189 (2006) (plurality) (Cappy, C.J., dissenting). In concluding the scope of bad faith conduct under § 8371 does not cover an insurer's conduct during litigation, Chief Justice Cappy stressed that an insurer's duty of good faith and fair dealing arises from the contractual relationship between the insurer and insured. *See id.*, at 1191. In his words, "[t]he relationship between the parties is defined by the insurance policy. Once that policy has been terminated, the claim paid, or the claim denied the relationship is over." *Id.* Thus, once the relationship has been severed, the duty of good faith between the parties is extinguished. *See id.*

While § 8371 may not provide a clear answer to whether it extends to the conduct of parties during the litigation of a bad faith claim, its plain language clearly precludes the imposition

of a duty of good faith preceding the execution of insurance coverage. The plain language "arising under an insurance policy" clearly contemplates the existence of an insurance policy at the time of the alleged wrongful conduct. Without a contractual relationship between the parties, the duty of good faith cannot exist. *See id.* Further, in order to "arise under an insurance policy," the action must bear some relation to the policy itself. Thus, the Superior Court dismissed a claim under § 8371 for an insurer's failure to pay a judgment against it because the plaintiff merely brought the action as a judgment creditor, not as a wronged insured. *See Ridgeway v. U.S. Life Credit Life Ins. Co.,* 793 A.2d 972, 976–77 (Pa.Super.2002). Similarly, appellant cannot allege appellees' conduct misrepresented the terms of her actual policy, but only her application for life insurance.

Accordingly, I agree that § 8371 cannot extend to claims relating to the conduct of insurers before the formation of an insurance contract. *See Brickman Group Ltd.,* at 930 ("Neither *O'Donnell* nor any other case interpreting § 8371 extends that section's protection to conduct preceding the execution of insurance coverage."); *Kilmore v. Erie Ins. Co.,* 407 Pa.Super. 245, 595 A.2d 623, 626 (1991); *see also Weisblatt v. Minn. Mut. Life Ins. Co.,* 4 F.Supp.2d 371, 380 (E.D.Pa.1998) ("The duty of good faith and fair-dealing ... 'applies only to the enforcement and performance of [insurance] contracts and not to their formation ....' " (citation omitted)). However, this does not preclude appellant from all relief and does not grant a license to insurance companies to mislead customers during solicitations. The Insurance Commissioner may still bring an action against the insurance company to enforce the unfair practices outlined in the UIPA. *See* 40 P.S. § 1171.8. Further, as appellant alleged in her complaint, an insured may bring a private claim under the Consumer Protection Laws. *See* 73 P.S. § 201–9.2.

Justice BAER joins this concurring opinion.

Justice SAYLOR, concurring and dissenting.

I join Part I and II(A) and (B) of the majority opinion. As to Part II(C), however, I differ with the majority's treatment of the parol evidence rule.

The majority accepts that the allegations of Toy's complaint concern a fully integrated contract but concludes that the parol evidence rule does not apply. *See* Majority Opinion, *op.* at 41–53, 928 A.2d at 205–07. The majority reasons that Ms. Toy's claim does not amount to fraud in the inducement (as to which the parol evidence rule would generally apply under prevailing Pennsylvania law), but rather, amounts to fraud in the execution (as to which the parol evidence rule does not apply). *See id.* In a footnote, the majority dismisses any argument that Ms. Toy's claims reflect allegations of fraud in the inducement, as opposed to fraud in the execution, by indicating that Defendants have not challenged the Superior Court's characterization of Ms. Toy's allegations in this regard. *See* Majority Opinion, *op.* at 52 n. 23, 928 A.2d at 206 n. 23.

In the first instance, although I agree with the majority that Defendants have not expressly controverted the Superior Court's characterization of Ms. Toy's as involving fraud in the execution, I believe that they have sufficiently challenged the Superior Court's reasoning by arguing, at length, that this matter is governed by *Yocca v. Pittsburgh Steelers Sports, Inc.,* 578 Pa. 479, 854 A.2d 425 (2004), which the majority characterizes as a case involving fraud in the inducement. *See* Majority Opinion, *op.* at 49–50, 928 A.2d at 205. Therefore, I would not resolve the questions concerning the applicability of the parol evidence rule based on waiver.

On the merits, Defendants advance an argument that there should be some reasonable limitations upon a party's ability to advance affirmative claims that very plainly conflict with their integrated, written agreements, even when the plaintiff employs the rubric of fraud. In particular, Defendants highlight that Ms. Toy's allegations as to the promise of a free-standing savings plan with an accumulated value of $100,000 in 23 years is squarely and repeatedly contradicted not only by the whole

life insurance policy which was the sole instrument that she received,[1] but also by the written application that she signed.[2] Defendants contend that applying an exception to the parol evidence rule in such circumstances would make the general rule so easy to avoid that it will amount to no rule at all.[3]

I agree with the tenor of this argument. I believe that the parol evidence rule subsumes an objective to promote certainty and stability of contract, and to place some reasonable limitations on the litigation exposure of the business community and others, by investing contracting parties with an obligation to read their written agreements and abide by clear terms, short of an allegation of fraud of a sort that would not be obvious from the face of the integrated agreement, and/or in the absence of circumstances in which reading the written agreement would not be reasonable. *Cf. Thorne v. Warfflein*, 100 Pa. 519 (1882) ("We cannot agree that it is proper to throw the whole case into the jury box on the ground of fraud,

1. The declarations page of the policy specifies a retirement-age guaranteed cash value of $11,000.

2. This application was entitled "APPLICATION FOR LIFE INSURANCE"; identifies Ms. Toy at the outset as the "Proposed Insured"; specifies a death benefit, provides for premium payments equal to the amount of Ms. Toy's investment; identifies a beneficiary; contains medical data consistent with an insurance application; and contains the words "Proposed Insured" immediately beneath the line on which Ms. Toy signed the application. Ms. Toy conceded in her deposition that she signed this application, but had either not read it or only skimmed it in reliance on Mr. Martini's representations that it was an application for a savings plan and not a life insurance policy. *See* Deposition of Georgina Toy at 111–16, 122–23, 129, 146–50.

3. *Cf.* WILLISTON ON CONTRACTS § 33.21, at 672 (4th ed.1999) ("[c]ourts have recognized ... that this fraud exception would swallow up the rule if representations made during negotiations, but not included in the contract as executed, could be characterized as fraud and then used to undo an otherwise complete agreement." (citation omitted)); Annotation, *Parol–evidence rule; right to show fraud in inducement or execution of written contract,* 56 A.L.R. 13, Pt. II ("That a mere failure to carry out an alleged parol promise made contemporaneously with a written agreement does not prove such a fraud in the inception of the contract as will warrant the admission of parol evidence to show the alleged promise seems clear both on reason and according to the weight of authority. To hold otherwise would, as has been pointed out, be reasoning in a circle and be a virtual abrogation of the parol-evidence rule itself").

simply because one of two parties to a written contract testifies that there were parol stipulations contradictory to the terms of the writing, agreed to at the same time. There must be evidence of fraud other than that which may be derived from the mere difference in the parol and written terms. We can find no such evidence in the present case, and we are, therefore, of opinion that the learned court below was in error in leaving the question of fraud to the jury.").[4]

In terms of containing the fraud exception to the parol evidence rule, the approach in Pennsylvania has been to maintain a distinction between reliance on fraud in the "making" of prior oral representations, versus fraud in the "omission" of terms from a subsequent written contract. For example, in *Bardwell v. Willis Co.*, 375 Pa. 503, 100 A.2d 102 (1953), the Court stated:

> There is not the slightest doubt that if plaintiffs had merely averred the falsity of the alleged oral representations, parol evidence thereof would not have been inadmissible. Does the fact that plaintiffs further averred that these oral representations were *fraudulently made* without averring that they were *fraudulently* or by accident or mistake *omitted* from the subsequent complete written contract suffice to make the testimony admissible? The answer to this question is "no"; if it were otherwise the parol evidence rule would become a mockery, because all a party to the written contract would have to do to avoid, modify or nullify it would be to aver (and prove) that the false representations were *fraudulenty (fraudulently)* made.

*Id.* at 507, 100 A.2d at 104 (emphasis in original).[5] The Court, however, has not closely developed the boundaries between

---

4. In discussing Ms. Toy's duties in relation to the reading of the written documents, notably, the majority only addresses her obligations relative to the reading of the life insurance policy. *See* Majority Opinion, *op.* at 54–55, 928 A.2d at 208. It makes no mention, however, of her failure to read (or otherwise apprehend the facial character of) the written application for life insurance which she signed. *See supra* note 2.

5. This concern appears to have been loosely translated into inducement/execution distinction the courts have made, although fraud in the inducement appears to most commonly be understood to encompass

fraudulent making and fraudulent omission, and it seems to me to be an open question whether it is sufficient, to lay claim to the fraud exception, for a contracting party to add to a claim of "fraudulent making" of representations concerning the subject matter of the integrated contract (a matter that is clearly outside the exception) an allegation that the defendant also suggested that the false terms were within the written contract, although they were most clearly not set forth in the contract.

For the policy reasons set forth in *Bardwell*, I believe that the Court should not so extend the fraud exception. In my view, in terms of the potential for opening the exception to ready abuse, there is a very modest difference between the making of representations concerning the subject matter of a contract, and general misrepresentations concerning actual terms of the written contract. Moreover, where written contractual terms are clear and apparent, the ability to review the document protects equally against either form of misrepresentation. In my view, in maintaining an exception to the parol evidence rule for "fraud in the omission," the Court should require something beyond mere obvious misrepresentations concerning the terms of an integrated contract.

Here, the circumstances entailed Ms. Toy's execution as the proposed insured of a document that was plainly, obviously, and consistently styled as an application for life insurance. Her position is, however, that she believed that the document was something entirely different based on Mr. Martini's oral representations concerning the subject matter. *See* Deposition of Georgiana Toy, at 95 ("Mr. Martini never in the entire presentation of the material that was given that evening indicated that what I was buying was a life insurance policy. The entire presentation was totally regarding a 50/50 savings plan, as he referred to it, and it was an investment."); 129 ("My assumption at the time was that what I was signing . . . was a contract to the savings plan."). In the absence of

misrepresentations about collateral facts and not facts concerning the nature or purport of the contract. *See* 37 AM.JUR 2D, FRAUD AND DECEIT § 2 (2007).

anything more in terms of factual circumstances that would cause Ms. Toy not to read or apprehend the written terms of her application, I believe that such allegations should fall within the purview of the parol evidence rule rather than the exception.[6]

I recognize that Ms. Toy's complaint contains substantially broader allegations of fraud, in which she asserts that Metropolitan Life had essentially institutionalized the practice of marketing life insurance policies disguised as free-standing savings plans. I agree with Judge Wettick's conclusion that she has failed to develop particular circumstances about her own transaction with Defendants such as would render her failure to apprehend its character sufficiently reasonable to justify excepting her claims from the effect of the parol

6. *Accord Domino's Pizza, LLC v. Deak,* 2007 WL 916896, *7 (W.D.Pa. March 23, 2007) ("Where the party has had sufficient opportunity to review the agreement prior to execution, the ability to subsequently claim fraudulent execution is all but eliminated"); *Belleville Nat'l Bank v. Rose,* 119 Ill.App.3d 56, 74 Ill.Dec. 779, 456 N.E.2d 281, 284 (1983) ("The defense of fraud is, in most situations, unavailable to avoid the effect of the written agreement where the complaining party could have discovered the fraud by reading the instrument, and was in fact afforded a full opportunity to do so."). *See generally* 4 COUCH ON INSURANCE § 56:15 (3d ed. 2007) ("[I]f the insured ... has ready access to the truth or to documents setting forth the truth, no liability of the insurer arises because of the agent's misstatements. Thus, the insured may be bound in spite of the agent's fraud if the insured signs the application without reading it, or retains the policy when delivered without reading it when such reading would have disclosed the falsity of the agent's representations.").

I acknowledge that there is some uncertainty in Pennsylvania regarding the scope of the reasonable expectations doctrine in the consumer insurance arena. I support the notion that consumers in this setting should not be disadvantaged for failing to study detailed policy terms at length in circumstances in which they could reasonably expect that coverage would be available. To Ms. Toy's understanding, however, the main thrust of her agreement with Metropolitan Life did not involve an insurance policy; moreover, I support Judge Wettick's conclusion that it is simply not reasonable for one in Ms. Toy's circumstances to maintain the understanding that she had secured a free-standing savings plan that was not life insurance, when the only application that she signed was one for life insurance, and the policy that she received was, on its face, materially out of sync with her asserted expectation. Notably, as well, the policy was subject to a ten-day "free-look" condition, providing Ms. Toy with a right to examine it, return it for any reason during that period, and secure a full refund.

evidence rule. At least in the context of claims for affirmative monetary damages, as opposed to those for equitable remedies such as rescission and restitution, I therefore support Judge Wettick's summary judgment determination.

As a final note, fraud of the type alleged by Ms. Toy need not go without redress, as the Insurance Commissioner has the authority to investigate such asserted conduct and to take appropriate remedial measures under the Unfair Insurance Practices Act. *See* Act of July 22, 1974, P.L. 589, No. 205, as amended, 40 P.S. §§ 1171.1–1171.15.

Justice CASTILLE joins this concurring and dissenting opinion.