NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-3031
_____

GEORGE V. KELLY

v.

PEERSTAR LLC; LARRY J. NULTON,
Appellants

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 3-18-cv-00126
District Judge:  The Honorable Kim R. Gibson
_____

No. 22-3087
_____

CHARLES J. KENNEDY,
Appellant

v.

GEORGE V. KELLY
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 3-18-cv-00187
District Judge:  The Honorable Kim R. Gibson

Submitted under Third Circuit L.A.R. 34.1(a)
June 30, 2023

Before: JORDAN, KRAUSE, and SMITH, *Circuit Judges*

(Filed July 27, 2023)

_____

OPINION[*]

_____

SMITH, *Circuit Judge.*

This case arises out of a business relationship gone sour. Appellants are Dr. Larry Nulton, a psychologist, his peer support service center, Peerstar LLC (Peerstar), and Dr. Charles Kennedy, a psychologist employed by Peerstar. Appellee is George Kelly, Dr. Nulton's former business partner who served as Chief Operating Officer at Peerstar. Kelly asserted a claim against Dr. Nulton and Peerstar for breach of a Settlement Agreement in which Dr. Nulton had agreed to buy out Kelly's ownership interest in Peerstar. Dr. Nulton and Peerstar asserted a host of counterclaims, including identity theft and fraudulent inducement to enter into the settlement agreement. Dr. Kennedy also initiated suit against Kelly alleging, *inter alia*, identity theft. The District Court consolidated these cases.

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

The District Court granted summary judgment for Kelly on the breach of contract and fraudulent inducement counterclaims. The identity theft claim proceeded to a bench trial, after which the District Court entered judgment in favor of Kelly. We will affirm.

## I. Background

Dr. Nulton is a licensed psychologist. He met Kelly in the late 1990s through their work at a social services center. Kelly was a case manager at the time. Dr. Nulton later recruited Kelly to join him at his own behavioral health center, Nulton Diagnostic and Treatment Center (NDTC). One lucrative division within NDTC provided behavioral health rehabilitative (BHR) services, a type of treatment for children with autism. Kelly eventually rose to the position of Chief Operating Officer (COO) of the division providing BHR services and helped the division succeed in growing from an operation with just a handful of employees to a thriving entity with a workforce of nearly 300 and a gross revenue of $10 million per year.

In 2005, Dr. Nulton transferred NDTC's BHR services programs to a separate entity called Children's Behavioral Health (CBH) and sold it to Providence Service Corporation for $14.5 million. Kelly remained with CBH as COO. Kelly held no ownership interest in NDTC, yet he and Dr. Nulton were close and amiable at the time. Dr. Nulton chose to give Kelly $1 million from the sale to Providence as a reward for Kelly's contributions to the growth and success of NDTC.

And Dr. Nulton and Kelly maintained their close relationship after the sale of CBH. They spoke regularly and developed a referral relationship for BHR services. CBH

3

referred most of its patients to NDTC for their required psychological evaluations. Drs. Nulton and Kennedy then prescribed—but did not provide—those services.

In 2009, Dr. Nulton asked Kelly to join Dr. Nulton's new business, Peerstar LLC, which provided behavioral health peer support services for adults. Kelly agreed and joined Peerstar as COO in exchange for a 25 percent ownership interest in the company. When a third party sold his ownership interest in Peerstar, Kelly's interest increased to approximately 38 percent of the company. Peerstar grew under Kelly's leadership and proved to be a profitable business venture for both Dr. Nulton and Kelly.

By March 2016, both the friendship and business relationship between Dr. Nulton and Kelly had deteriorated. The two men attempted to negotiate the sale of Kelly's share in Peerstar, but their efforts were unsuccessful. The dispute ended up in federal court, with Dr. Nulton seeking a declaratory judgment that Peerstar's operating agreement permitted him to purchase Kelly's ownership interest at a certain price. The parties reached a settlement (Settlement Agreement) in September 2016, in which Dr. Nulton agreed to buy out Kelly's share for $4.3 million plus interest, which was to be paid in 60 monthly installments.

Approximately one and a half years later, Dr. Nulton stopped making the monthly payments to Kelly. Dr. Nulton alleged that he stopped the payments when he learned that CBH, under Kelly's leadership, had used both his and Dr. Kennedy's names on insurance forms without obtaining their authorizations. Kelly filed suit against Dr. Nulton and Peerstar in the Western District of Pennsylvania for breach of the Settlement Agreement. Dr. Nulton and Peerstar asserted several counterclaims, including claims for fraudulent

4

inducement of the Settlement Agreement and identity theft under Pennsylvania state law. Dr. Kennedy also sued Kelly for identity theft, among other related claims.

In support of their fraudulent inducement claim, Dr. Nulton and Peerstar alleged that Kelly concealed that he had forged Dr. Nulton's signatures on CBH's insurance forms. Dr. Nulton claimed that had he known of the forgery, he would never have signed the Settlement Agreement. Dr. Nulton and Peerstar also asserted fraudulent inducement as an affirmative defense to Kelly's breach of contract claim. The District Court resolved these issues on the parties' cross-motions for summary judgment, ruling in favor of Kelly on both his breach of contract claim and his defense to Dr. Nulton's and Peerstar's fraudulent inducement claim. The District Court held that because the Settlement Agreement was fully integrated, Dr. Nulton and Peerstar could not introduce parol evidence to show fraudulent inducement. Without that evidence, their claim and affirmative defense failed.

For their identity theft claims, Drs. Nulton and Kennedy alleged that Kelly had forged their signatures and placed their identifying information on various insurance forms, representing falsely that they were "rendering providers" of BHR services. Drs. Nulton and Kennedy did not actually provide BHR services, but only prescribed such services. According to Drs. Nulton and Kennedy, Kelly personally forged their signatures in order to get CBH accredited with private insurers. Drs. Nulton and Kennedy sought statutory damages of $500 for every claim that CBH submitted to insurers under their names, which they claimed totaled over 45,000 claims.

The identity theft claim proceeded to a bench trial. The District Court concluded that Drs. Nulton and Kennedy failed to carry their burden as to each element of identity theft. Accordingly, the District Court entered final judgment in favor of Kelly.

## II.  Discussion[1]

Dr. Nulton, Dr. Kennedy, and Peerstar appeal two aspects of the final judgment: (1) entry of judgment in favor of Kelly on his breach of contract claim and on Dr. Nulton and Peerstar's fraudulent inducement claims; and (2) entry of judgment in favor of Kelly on Drs. Nulton and Kennedy's identity theft claims.

### A.  Breach of Contract Claim and Fraudulent Inducement Counterclaims

As to the breach of contract claim and the fraudulent inducement counterclaims, Dr. Nulton and Peerstar argue that the District Court misapplied the parol evidence rule because the Settlement Agreement does not contain a fraud-insulating clause. And even if it does, Dr. Nulton and Peerstar argue that they may still assert a fraudulent inducement affirmative defense.

Under Pennsylvania law, parol evidence of fraudulent inducement is barred if the contract contains what this Court has termed a "fraud-insulating clause." *SodexoMAGIC, LLC v. Drexel University*, 24 F.4th 183, 213–15 (3d Cir. 2022) (summarizing Pennsylvania law); *see Bardwell v. Willis Co.*, 100 A.2d 102, 104 (Pa. 1953); *Toy v.*

---

[1] The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291. We review entry of summary judgment de novo. *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023). "On appeal from a bench trial, our court reviews a district court's findings of fact for clear error and its conclusions of law *de novo*." *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 282–83 (3d Cir. 2014).

*Metropolitan Life Insurance*, 928 A.2d 186, 205–07 (Pa. 2007). Fraud-insulating clauses may "take many forms," but all serve the same purpose of "prevent[ing] a party from satisfying the justifiable-reliance element of a fraudulent inducement claim." One form of a fraud-insulating clause is a "no-reliance" clause, in which the parties disclaim reliance on any extra-contractual representations or understandings in reaching the agreement. *Id.* at 214. Such a clause insulates parties to a written agreement from claims of fraudulent inducement by precluding any such party from claiming justifiable reliance on alleged misrepresentations.

The Settlement Agreement contains two pertinent clauses. First, the parties agreed that the Settlement Agreement was their "entire agreement and understanding" and that it "supersede[d] all prior negotiations and/or agreements." JA 3442–43. Second, they agreed that the Settlement Agreement would "remain[] in effect despite any . . . discovery or existence of any new or additional fact, or any fact different from that which either [p]arty now knows or believes to be true." JA 3443.

These clauses work to bar parol evidence of fraudulent inducement. Their effect is to prevent Dr. Nulton and Peerstar from claiming that they justifiably relied on any matter that Kelly may have concealed up to the time the Settlement Agreement was executed. And these clauses resemble contractual language that Pennsylvania appellate courts have treated as fraud-insulating clauses. *See Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438–39 (Pa. 2004) ("This Agreement contains the entire agreement of the parties with respect to the matters provided for herein and shall supersede any representations or agreements previously made . . . ."); *1726*

7

*Cherry St. P'ship v. Bell Atl. Props., Inc.*, 653 A.2d 663, 665 (Pa. Super. Ct. 1995) ("[T]here are no other agreements, understandings, representations or warranties between them except as set forth herein.").

Turning to Dr. Nulton and Peerstar's fraudulent inducement affirmative defense, the Court sees no basis under Pennsylvania law to conclude that parol evidence barred for purposes of a fraudulent inducement claim should be admissible to prove a defense of fraudulent inducement. Dr. Nulton and Peerstar point to authority that stands for the uncontroversial proposition that a fraudulent contract is invalid. But as explained above, when a signatory to a contract expressly disavows reliance on extra-contractual "understandings" or new facts, there can be no fraud in the inducement.

Appellants also call our attention to a quotation from *Blumenstock v. Gibson*, in which the Pennsylvania Superior Court states: "the theory holds that since fraud induced the agreement, no valid agreement came into being and parol evidence is admissible to show that the alleged agreement is void." 811 A.2d 1029, 1036 (Pa. Super. Ct. 2002). But in the next sentence, the Court explains: "Nevertheless, the case law clearly holds that a party cannot justifiably rely upon prior oral representations yet sign a contract denying the existence of those representations." *Id.* In other words, even though a court generally may set aside a contract founded on fraud, there is no fraud when the contract disclaims any reliance on representations beyond those stated in the contract. Those very circumstances are present here.

8

In sum, we conclude that the District Court properly applied the parol evidence rule as to both Kelly's breach of contract claim and Dr. Nulton and Peerstar's fraudulent inducement counterclaim.

## B. Identity Theft Claims

Pennsylvania's identity theft statute provides: "A person commits the offense of identity theft of another person if he possesses or uses, through any means, identifying information of another person without the consent of that other person to further any unlawful purpose." 18 Pa. Cons. Stat. § 4120(a). As to the CBH insurance forms, the District Court found that Drs. Nulton and Kennedy failed to prove that Kelly: (1) used or possessed their identities; (2) without their consent. JA 96–123. Drs. Nulton and Kennedy argue that the District Court erred on both fronts.

First, Drs. Nulton and Kennedy argue that the District Court misconstrued the Pennsylvania identity theft statute by finding that they failed to prove that Kelly "placed" their signatures on the insurance forms. Drs. Nulton and Kennedy contend that the District Court's use of the word "placed" in its Bench Trial Memorandum effectively added an element to the statute, which requires only that the defendant "possess or use" the plaintiff's identifying information. *See* 18 Pa. Cons. Stat. § 4120(a).

The District Court did not add an element to the identity theft statute. The District Court merely described the ways that Drs. Nulton and Kennedy had alleged that Kelly "possessed or used" their identities. Throughout all stages of litigation, Drs. Nulton and Kennedy have alleged that Kelly "forged" their signatures and "placed" their identifying

9

information on the insurance forms.[2] It is true that in Drs. Nulton and Kennedy's response to Kelly's proposed findings of fact and conclusions of law, they argued that forgery was not a required element of identity theft. JA 3031–32. But the District Court did not require Drs. Nulton and Kennedy to prove forgery. Rather, the judge simply found that Drs. Nulton and Kennedy failed to prove the facts that they alleged.

Next, Drs. Nulton and Kennedy argue that Kelly is liable for identity theft as a matter of law because it is undisputed that Kelly signed the insurance forms in his own capacity as COO. Even if we were to assume for the sake of argument that Kelly "possessed or used" Drs. Nulton and Kennedy's identities, Drs. Nulton and Kennedy have not undermined the District Court's finding as to the second element of their claim. After weighing all the testimony and other evidence, the District Court declined to find that Drs. Nulton and Kennedy's identities "appeared on the [insurance] form without their consent." JA 103–04 & n.20. We will not disturb that finding.

Having concluded that there was no clear error in the District Court's findings as to the first two elements, we need not address Drs. Nulton and Kennedy's argument as to the third element of identity theft.

## III.    Conclusion

For the foregoing reasons, we will affirm.

---

[2] *See* JA 416 (Answer, Affirmative Defenses, and Counterclaims); JA 1600–01 (Motion for Summary Judgment); JA 2797 (Trial Brief); JA 2952 (Proposed Findings of Fact and Conclusions of Law); JA 2976 (Brief in Support of Proposed Findings of Fact and Conclusions of Law).